# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| ANDREW SCULL, Individually and On Behalf of All Others Similarly Situated,<br><br>                       Plaintiff,<br><br>vs.<br><br>COMPELLENT TECHNOLOGIES, INC., PHILIP E. SORAN and JOHN R. JUDD,<br><br>                       Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>Civ. No. _____<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED |

Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Compellent Technologies, Inc. ("Compellent" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal class action on behalf of purchasers of the common stock of Compellent between October 28, 2009 and April 7, 2010, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

4.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

1

5.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**PARTIES**

6.     Plaintiff Andrew Scull, as set forth in the accompanying certification and incorporated by reference herein, purchased the common stock of Compellent during the Class Period and has been damaged thereby.

7.     Defendant Compellent develops, markets, and services enterprise-class network storage solutions in the United States and internationally.

8.     (a)    Defendant Philip E. Soran ("Soran") was, at all relevant times, Chairman of the Board, President and Chief Executive Officer of Compellent.

(b)    Defendant John R. Judd ("Judd") was, at all relevant times, Chief Financial Officer of Compellent.

(c)    Defendants Soran and Judd are collectively referred to herein as the "Individual Defendants."

9.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Compellent, were privy to confidential and proprietary information concerning Compellent, its operations, finances, financial condition and present and future business prospects.  The Individual Defendants also had access to material adverse non-public information concerning Compellent, as discussed in detail below. Because of their positions with Compellent, the Individual Defendants had access to non-

2

public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

10. The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Compellent's business.

11. The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

3

12.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the New York Stock Exchange ("NYSE") and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Compellent's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Compellent's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

13.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Compellent's common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Compellent's business, operations and management and the intrinsic value of Compellent's securities; (ii) allowed the Company and Compellent insiders to complete a secondary offering of more than 3.3 million shares of Compellent common stock, generating approximately $64 million in proceeds; and (iii) caused Plaintiff and members of the Class to purchase Compellent common stock at artificially inflated prices.

4

## CLASS ACTION ALLEGATIONS

14.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of Compellent between October 28, 2009 and April 7, 2010, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

15.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Compellent common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Compellent or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

16.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

17.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

5

18.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Compellent;

(c)     whether the price of Compellent common stock was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

19.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.   There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

20.     Defendant Compellent describes itself as a "leading provider of enterprise-class network storage solutions that are highly scalable, feature-rich and designed to be easy to use and cost effective."

21.    The Class Period begins on October 28, 2009.  On that date, the Company

issued a press release announcing its financial results for the third quarter of 2009, the period

ended September 30, 2009.  For the quarter, the Company reported revenue of $32.2 million

and GAAP net income of $2.3 million, or $0.07 per share.  Defendant Soran, commenting on

the results, stated, in pertinent part, as follows:

> We believe our third quarter results demonstrate strong momentum as
> customers see the value proposition of our efficient, scalable storage solutions.
> This quarter we experienced strength across all geographies and a growing
> awareness of the Compellent solution.  As the demand for efficient storage
> technologies continue, regardless of whether companies are virtualizing IT,
> building private clouds or buying cloud services, we continue to gain traction
> in the marketplace.
>
> We believe Compellent's storage platform is appealing for enterprises of all
> sizes because, at its heart, it is an architecture that has the future built in.  It is
> designed to be open and flexible, which we believe makes it the ideal engine
> for the cutting-edge IT infrastructures of today – such as cloud computing
> offerings from Savvis.

22.    Following the third quarter earnings announcement, Defendants held a

conference call with analysts and investors.  With regard to the Company's gross margins,

Defendant Judd stated, in pertinent part, as follows:

> Our gross margin increased to 57.2% in the just-completed third quarter of
> 2009, compared to 53.7% in the second quarter of 2009.  During the quarter,
> product margin was 52.3%, and support and services margin was 69.4%.  The
> increase in product margin is a reflection of several strong margin deals versus
> margin improvements across all end users.

With regard to the Company's outlook for the fourth quarter, Defendant Judd stated, in

pertinent part, as follows:

> I would now like to provide some guidance on the coming quarter.  As Phil
> highlighted earlier, **we see strength in our markets.  We continue to see
> strong growth in our current pipeline and our registered deal activity**.
> Our current forecast is for revenue to be between $34 million and $36 million.

7

This would mark our 17th consecutive quarter of revenue growth. We expect to continue to invest in our technology and sales teams, so as a result we expect our operating costs in the fourth quarter will increase from third quarter spending by 8% to 10%. [Emphasis added.]

In response to a question regarding the Company's gross margins, Defendant Judd responded, in pertinent part, as follows:

KATY HUBERTY: . . . the other obvious question is whether you think the new level of product growth margin is sustainable given the pricing and competitive environment?

JACK JUDD: Great question there Katy, and I think I'm going to encourage everybody to be a little more conservative than we were in this quarter. This was a really, really nice uptick in our revenue, I mean, in our gross margin, on the product, and I would say that we have a good chance that it will come back a little bit. And I want to emphasize again, is that you know we, we go out there and compete every day for deals. And we're going to continue.

In response to a question regarding the Company's product margins, Defendants Soran and Judd responded, in pertinent part, as follows:

ALEX KURTZ: Okay, last question for Jack, here. Can you just give a little more color on the product margin increase quarter over quarter, sort of what were the drivers there, and thanks again.

JACK JUDD: On the products side, and I'll go back to what we said when we did our talk, is that we had several deals that were noticeably higher on margin that actually had some pretty good ticker size to them. **It wasn't as if you could go across all of our deals and notice that each one was a fraction higher than it was in the previous quarter. And so, I think it speaks well to our sales force.** It speaks well to having consisting customers coming back for upgrades and for our new systems, and I think that the big pop in it was more related to deals, some deals, versus overall. [Emphasis added.]

PHIL SORAN: But we were able to hold margins in a tough economic environment.

JACK JUDD: Right.

PHIL SORAN: That's really positive.

JACK JUDD: Really positive.

8

23.    On or about November 17, 2009, Compellent filed with the Securities and

Exchange Commission ("SEC") a Form S-3/A Registration Statement (the "Registration

Statement"), for the Secondary Offering.

24.    On or about November 18, 2009, the Prospectus (the "Prospectus") with

respect to the Secondary Offering, which forms part of the Registration Statement, became

effective and more than 3.3 million shares of Compellent's common stock were sold to the

public, thereby raising more than $64 million.

25.    In positively describing the Company's business, the Registration Statement

provided, in pertinent part, as follows:

> We are a leading provider of enterprise-class network storage solutions that
> are highly scalable, feature rich and designed to be easy to use and cost
> effective. Our Storage Center is a Storage Area Network, or SAN, that is
> designed to significantly lower storage and infrastructure capital expenditures,
> reduce the skill level and number of personnel required to manage information
> and enable continuous data availability and storage virtualization. Storage
> Center is based on our innovative Dynamic Block Architecture, which enables
> users to intelligently store, recover and manage large amounts of data. We
> combine our sophisticated software with standards-based hardware into a
> single integrated solution. We believe that Storage Center is the most
> comprehensive enterprise-class network storage solution available today,
> providing increased functionality and lower total cost of ownership when
> compared to traditional storage systems. According to IDC, the total market
> for SAN storage system hardware in 2008 was $14.7 billion and the total
> market for all storage software in 2008 was $11.8 billion. In addition,
> according to Gartner, Inc., a third-party industry analyst, between 2008 and
> 2013, storage demand, as measured by terabyte capacity, is expected to
> increase by 800%.

> We developed our Storage Center software and hardware solution to target
> mid-size enterprises. We believe mid-size enterprises are acutely impacted by
> the proliferation of data and their need for a scalable and cost-effective storage
> solution has historically been unmet. We believe our business model is highly
> differentiated and provides us with several competitive advantages. We sell
> our products through an all-channel assisted sales model designed to enable us

to quickly scale and cost effectively increase sales. We also employ a virtual manufacturing strategy, which significantly reduces inventory and eliminates the need for in-house and outsourced manufacturing.

We have achieved broad industry recognition for our innovative storage solution. Compellent was awarded consecutive "Technology of the Year" awards from InfoWorld, including being named the "Best SAN" of 2008. In 2008, Compellent was also named Microsoft's Partner of the Year for Advanced Infrastructure Solutions, Storage Solutions and awarded Storage magazine's "Quality" Award. Gartner reported Compellent to be the fastest growing storage area network company in 2006 and 2007, and TheInfoPro, an independent research firm, recently cited Compellent's automated tiered storage as the No. 1 technology in use for Information Lifecycle Management according to mid-sized end users.

26.     The Registration Statement represented that "We believe our recent rapid growth has masked the cyclicality and seasonality of our business. *The third quarter is generally the slowest sales quarter in the storage industry.*"

27.     The statements referenced above in ¶¶21, 22, 24, 25 and 26 were each materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)     that the Company was experiencing increasing competition which was forcing it to dramatically lower prices in order to continue to generate sales in line with internal expectations;

(b)     that as a result of increased competition, the Company was being forced to raise expenditures associated with acquiring new customers far in excess of internal expectations;

(c)     that the Company was experiencing significant issues with its sales force which were further complicating and exacerbating the negative impact of slowing sales;

(d)     as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company and its prospects.

28.     On February 11, 2010, the Company issued a press release announcing its financial results for the fourth quarter and year end of 2009, the period ended December 31, 2009.  For the quarter, the Company reported revenue of $36.3 million and GAAP net income of $1.3 million, or $0.04 per share.  Defendant Soran, commenting on the results, stated, in pertinent part, as follows:

> This strong fourth quarter performance capped another successful year at Compellent.  We generated record results in revenue, end-user customers, earnings and cash.  This demonstrates the positive impact that our Fluid Data architecture has on customer environments, the strength of our efficient business model, and our ability to drive revenue and profit with our channel partners.  During the quarter, we continued to see our target midsized enterprise market as well as larger enterprises choosing Compellent over incumbent storage vendors.

> As we look ahead, we remain positive about the growing demand for our innovative storage technology and we continue to build our presence in new markets, taking mind and market share from the competition.  Our solution has broad appeal and is attracting strong interest from larger organizations and those considering emerging applications for cloud computing.  As always, we remain focused on generating profits and cash, while making the investments required to maximize future growth and profit.

29.     Following the fourth quarter earnings announcement, Defendants held a conference call with analysts and investors.  In response to questions regarding the Company's gross margins, Defendants Soran and Judd stated, in pertinent part, as follows:

11

AARON RAKERS: I guess -- hi, guys -- the first question for me would be, you know, back on the gross margin. I know you guys said your gross margin would be up here into this next quarter, but I think maybe it would be helpful to understand the -- is there any way to quantify the inputs to the gross margin pressure that you saw last quarter, be it how do we think about maybe supply tightness, et cetera as having an impact that looks to lift here as we move forward?

PHIL SORAN: No, I'd like to say that there were some supply constraints that we were able to work around, so that didn't affect us. But with that I think there also tended to be, you know, I kind of hinted at a little bit in my comments, that costs tend to stay flat where you tend to see a little bit of a steady decline. So that didn't happen last quarter, and we anticipate that would happen this quarter, so I think that'd be a positive impact on that. But that was a real small piece of the margin. But the good news is some of the things you -- that hit the margins are going to lead to positive in the future. Getting more entry configs on the footprints in the floor really helps, and those upgrades tend to be higher margins. And then also getting some of those key accounts we think will lead us to new opportunities, too. So I think there's some good news in there.

AARON RAKERS: So let me ask it this way, so over the last couple of quarters the gross margin has obviously bounced around. Maybe on average it's been somewhere in the 54ish percent range. Is that the right range? What's the right range to be thinking about for 2010 for you guys from a model perspective?

JACK JUDD: I think that we're trying to say that the margin did bounce around an awful lot. I actually think the third quarter margin was probably higher than what we'll experience long term in this business. But the numbers that we experienced last year are all within our business model, and what we're trying to make sure people understand is that the number we had in the fourth quarter, while lower, is still within the range we need to be to hit our long-term operating margin goals.

\*       \*       \*

RAJESH GHAI: Yes, thanks. Just delving a little bit deeper into the gross margin issue, so you mentioned that you had a higher number of footprint deals and entry level deals that caused the gross margin to be a little lower. So what is different in these deals that, you know, because I notice that your new customer number hasn't really declined and has actually gone up, so I'm just wondering what is different in these deals than in the past? Is it the

environment? More competition? Or is it more customers still not willing to, you know, still trying to get more discounts out of you?

PHIL SORAN: No, so like I said I think there's some real positives in here. So one of the nice things about our product is it's able to bridge or it can actually scale from the entry to the enterprise with the same product, the same storage center product. So let's talk a little bit about the entry. If you're going to have a scalable product at the entry you have to put the hardware infrastructure in there that's capable of scaling. So with a cluster controller type architecture you have to build that infrastructure upfront and then from then on it's simple addition of disk and disk technologies there. So you're kind of setting yourself up for some long-term savings but you're kind of building up an enterprise infrastructure upfront. So, therefore, you have a little bit more hardware you've got to buy, which has a little bit lower margin. On the higher end deals, you know, there's just some deals that you decide that this footprint is worth being aggressive on, and you do it because you're going to get paid back long term. So, once again, I think there's a lot of opportunity there.

30.     Upon this announcement, shares of the Company's stock fell $5.33 per share, or 24%, to close at $16.44 per share, on unusually heavy trading volume. However, Defendants continued to conceal the true scope and extent of Compellent's problems.

31.     Then, on April 7, 2010, the Company issued a press release announcing its preliminary financial results for the first quarter of 2010, the period ended March 31, 2010. For the quarter, the Company expects to report revenue in a range of approximately $31.5 to $32.0 million and gross margins to increase between 100 and 200 basis points from the fourth quarter 2009 results. Defendant Soran, commenting on the disappointing outlook, stated, in pertinent part, as follows:

This sequential decrease in revenue is mainly due to seasonality that had more of an impact on the Company this quarter than it has previously, changes made to optimize our sales organization, and *delays in larger revenue orders*. We remain positive about the outlook for Compellent's continued growth. The reception to our innovative storage technologies remains strong and we believe we have the best solutions available to address the requirements of rapidly emerging markets such as data center virtualization.

13

Our team continues to look for areas to improve our operations. We fully expect that the strategies that have enabled our success over the past few years including our dynamic feature-rich storage solution, our marketing and sales emphasis on mid-size enterprises, our investment in our channel partners and our unique business model will lead us to a return to sequential revenue growth in the second quarter of 2010. We will provide second quarter financial guidance when we report our full financial results for the first quarter 2010.

32.    Upon this announcement, shares of the Company's stock fell $4.54 per share, or 26%, to close at $13.02 per share, on unusually heavy trading volume.

33.    The market for Compellent common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Compellent common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Compellent common stock relying upon the integrity of the market price of Compellent common stock and market information relating to Compellent, and have been damaged thereby.

34.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Compellent common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

35.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Compellent's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Compellent and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

### Additional Scienter Allegations

36.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Compellent, their control over, and/or receipt and/or modification of Compellent's allegedly materially misleading misstatements and/or their associations with the Company, which made them

privy to confidential proprietary information concerning Compellent, participated in the fraudulent scheme alleged herein.

37.     Defendants were further motivated to engage in this course of conduct in order to allow Compellent, Defendant Soran and certain Company insiders to complete the Secondary Offering and generate $64 million in proceeds.

## Loss Causation/Economic Loss

38.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Compellent common stock and operated as a fraud or deceit on Class Period purchasers of Compellent common stock by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Compellent common stock fell precipitously as the prior artificial inflation came out. As a result of their purchases of Compellent common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, i.e., damages, under the federal securities laws.

39.     By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of Compellent's business and prospects. Defendants' false and misleading statements had the intended effect and caused Compellent common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $24.40 per share on January 19, 2010.

40.     As a direct result of the disclosures on February 11, 2010 and April 7, 2010, the price of Compellent common stock fell precipitously. These drops removed the inflation

from the price of Compellent common stock, causing real economic loss to investors who had purchased Compellent common stock during the Class Period.

41.     The 40% decline was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the price decline in Compellent common stock negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, i.e., damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Compellent common stock and the subsequent significant decline in the value of Compellent common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

### Applicability of Presumption of Reliance:
### Fraud on the Market Doctrine

42.     At all relevant times, the market for Compellent common stock was an efficient market for the following reasons, among others:

(a)     Compellent common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     as a regulated issuer, Compellent filed periodic public reports with the SEC and the NYSE;

(c)     Compellent regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press

17

releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Compellent was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

43.    As a result of the foregoing, the market for Compellent common stock promptly digested current information regarding Compellent from all publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all purchasers of Compellent common stock during the Class Period suffered similar injury through their purchase of Compellent common stock at artificially inflated prices and a presumption of reliance applies.

**No Safe Harbor**

44.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-

looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Compellent who knew that those statements were false when made.

## COUNT I

### Violation of Section 10(b) of
### the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

45.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

46.     During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

47.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

48.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Compellent common stock. Plaintiff and the Class would not have purchased Compellent common stock at the prices

they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

49.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Compellent common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of
### the Exchange Act Against the Individual Defendants

50.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

51.     The Individual Defendants acted as controlling persons of Compellent within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of Compellent, and their ownership of Compellent stock, the Individual Defendants had the power and authority to cause Compellent to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: April 14, 2010

**ZIMMERMAN REED, P.L.L.P.**

Carolyn G. Anderson, No. 275712
Kirsten D. Hedberg. Hedberg, No. 344369
651 Nicollet Mall, Suite 501
Minneapolis, MN  55402
Telephone: 612.341.0400
Fax: 612.341.0844
Carolyn.Anderson@zimmreed.com
Kirsten.Hedberg@zimmreed.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
Samuel H. Rudman
David A. Rosenfeld
Mario Alba, Jr.
58 South Service Road, Suite 200
Melville, NY  11747
Telephone: 631.367.7100
Fax: 631.367.1173

HOLZER HOLZER & FISTEL LLC
Michael I. Fistel, Jr.
200 Ashford Center North, Suite 300
Atlanta, GA  30338
Telephone:  770.392.0090
Fax:  770.392.0029

*Attorneys for Plaintiff*

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

The undersigned declares, as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed the complaint and authorized its filing.

2.      Plaintiff did not purchase and/or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.  I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

4.      Plaintiff's transactions in the security that is the subject of this action during the Class Period are as follows:

Purchases:

| Name of Company | Date(s) Purchased | # Shares Purchased | Cost |
|---|---|---|---|
| CML | 11/3/09 | 340 | $6,700.96 |

Sales:

| Name of Company | Date(s) Sold | # Shares Sold | Proceeds |
|---|---|---|---|
| CML | | | |

5.      During the three (3) years prior to the date of this certification, Plaintiff has not sought to serve or served as a class representative in an action filed under the federal securities laws except for the following (if any):

6.      Plaintiff will not accept any payment for serving as a representative party on behalf

of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 13th day of April, 2010 in San Diego , CA .
City State

(Signature) X _Andrew Scull_