UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| ANDREW SCULL, Individually and On Behalf of All Others Similarly Situated,<br><br>                  Plaintiff,<br><br>  vs.<br><br>COMPELLENT TECHNOLOGIES, INC., PHILIP E. SORAN, JOHN R. JUDD, JOHN P. GUIDER, CHARLES BEELER and R. DAVID SPRENG,<br><br>              Defendants. | Civ. No. 0:10-cv-01525-PJS-SRN<br><br><u>CLASS ACTION</u> |
| ANDREW McDONALD, Individually and On Behalf of All Others Similarly Situated,<br><br>                  Plaintiff,<br><br>  vs.<br><br>COMPELLENT TECHNOLOGIES, INC., PHILIP E. SORAN, JOHN R. JUDD, JOHN P. GUIDER, CHARLES BEELER and R. DAVID SPRENG,<br><br>              Defendants. | <u>CLASS ACTION</u><br><br><br><br><br><br><br><br><br><br><u>DEMAND FOR JURY TRIAL</u> |

CONSOLIDATED COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS
[CORRECTED CAPTION]

573444_2

**INTRODUCTION**

1.      This is a federal securities class action on behalf of purchasers of Compellent

Technologies Inc. ("Compellent" or the "Company") securities during the period October 28,

2009 through April 7, 2010 (the "Class Period") seeking to pursue remedies under §§10(b)

and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act" or "Exchange Act") and

Rule 10b-5.  This action is brought against Compellent and the Company's senior officers

and directors, Philip Soran, John Judd, Charles Beeler, R. David Spreng, and John Guider

(collectively referred to as the "Individual Defendants").

2.      Compellent is an independent storage systems vendor focused on mid-range

enterprise Storage Area Network ("SAN").  All of Compellent's sales are derived from its

storage systems and related software and maintenance contracts.

3.      Throughout the Class Period, defendants misrepresented Compellent's ability

to continue sequential revenue growth without relying on aggressive pricing.  Defendants

falsely assured the market about the strength of Compellent's product pipeline, its revenue

expectations and gross margin rate.  In reality, by the start of the Class Period, Compellent

had already embarked on an aggressive price discounting strategy to achieve continued

revenue growth, because its channel partners, including Insight Investments ("Insight"), were

30%-50% behind their 2009 sales goals.  As a result of defendants' misrepresentations,

Compellent's stock price rose from $17.96 on October 28, 2009 to an all time high of over

$24.40 during the Class Period.

573444_2

4.     Defendants took advantage of their intentional inflation of Compellent's stock price to complete a public secondary offering of Compellent stock and to unload 2.83 million of their Compellent shares for proceeds of more than $51.7 million.

5.     Moreover, shortly after defendants' revenue and gross margin misrepresentations and omissions at the beginning of the Class Period, defendants amended the Company's 2009 Management Incentive Compensation Plan ("2009 Incentive Plan") to allow defendants Soran, Judd and Guider ("Incentive Plan Defendants") to achieve up to 92% of their yearly compensation as a cash bonus.

6.     On February 11, 2010, in contrast to defendants' earlier misrepresentations and omissions, Compellent reported that its gross margin had severely dropped 440 basis points from its 3Q09 gross margin and 200 basis points from its 4Q08 gross margin.  As a result of this Company specific information, Compellent's stock price fell $5.33 a share or 24%.

7.     Defendants combined the negative news of the Company's gross margin shortfall with false positive statements and omissions that Compellent's pipeline was robust and would drive higher revenue and gross margin in 1Q10.  Because of defendants' false assurances regarding the Company's growth, and lack of full and complete disclosure, Compellent's stock continued to trade at artificially inflated prices.

8.     On April 7, 2010, Compellent pre-announced that it would fall woefully short of its 1Q10 revenue projections, but its gross margin had returned to pre-4Q09 levels.  On this news, Compellent's share price fell from $17.56 on April 7 to $13.02 on April 8, a 26% drop.  The market now became fully aware of Compellent's true financial condition –

573444_2

Compellent could not generate sequential revenue growth without aggressive price discounts.

## SUMMARY

9.      Although formed in 2002, Compellent became public in late 2007.  At the start of the Class Period in October 2009, Compellent had yet to achieve full year profitability – the key to doing so was revenue growth and a stable and higher gross margin.  Analysts and investors were thus keenly interested in the Company's revenue growth and gross margin, particularly whether growth was achieved through aggressive discounts at the expense of profitability.

10.     Starting in April 2009 and up to the start of the Class Period, defendants continued to tout Compellent's quarter-over-quarter sequential increase in revenue, Compellent's strong customer pipelines and stabilizing and increasing gross margin. Defendants represented to the market that Compellent's positive growth would continue through the second half of 2009 and into 2010.  Defendant Judd also touted Compellent's pipeline and "emphasize[d]" Compellent's "very, very good forecasting system."

11.     Based on defendants' statements that revenue would continue to increase sequentially and gross margin would stabilize and improve in the second half of 2009 into 2010, the market believed that Compellent was less reliant on price concessions to attract customers and generate revenue – which would help Compellent achieve full-year profitability.  Following Compellent's July 29, 2009 analyst call, analysts raised quarter and year-end expectations while noting that "[m]anagement expects [Gross Margin] improvement for the remainder of the year."

- 3 -

12.     On October 28, 2009, Compellent announced record results for 3Q09. Compellent posted impressive sequential revenue growth and unprecedented gross margin. Compellent achieved a 31% increase in revenue from 3Q08 and a 12% increase from 2Q09 – marking the Company's 16th consecutive quarterly increase in revenue.  Revenue for 3Q09 was above Street consensus and achieved with a record gross margin of 57.2% – a 350 basis point increase from 3Q09 and 3Q08. These results were viewed as especially impressive because industry analysts believed that the third quarter is generally the slowest sales quarter in the storage industry.

13.     In a conference call held that day, defendants stressed that Compellent would continue to see "strong growth in current pipeline" and continue to grow revenue in the 4Q09.  Defendants also told the market that gross margin could decrease "***a little bit***," and stressed that Compellent was "***able to hold margins*** in a tough economic environment."

14.     Defendants then guided for revenue to be between $34 million and $36 million – above Street consensus.

15.     Analysts reacted positively to Compellent's 3Q09 results and revenue guidance, raising their year-end estimates and expectations for 2010, noting, for example, that "Compellent management indicated that business conditions have continued to improve and that the pipeline of deals remains strong heading into the December quarter.  Revenue guidance of $34-$36Mn is above current Street consensus of $33.9Mn."  Taking note that "management expects a ***slight decrease*** in [gross margin]" – analysts modeled their gross margin levels to "more normalized levels" between high 54% and low 55% – in line with Compellent's 4Q08 gross margin of 54.9%.

- 4 -

16.     Based on defendants' false statements and omissions, the Company's share price immediately rose 5% from $17.96 to $18.84.

17.     Defendants' October 28, 2009 statements were materially false and misleading when made because of the following undisclosed facts:

(a)     Defendants had multiple large footprint deals in the pipeline that required aggressive price discounts to close, which would lower gross margin, specifically product margin, and reduce overall profitability and earnings per share ("EPS");

(b)     Compellent had to offer steeper price concessions on large footprint deals to close them and achieve revenue projections so that the Incentive Plan Defendants could more than double their year-end bonus;

(c)     By the time of the 3Q09 analyst call, the Company had 75% of its deals in its pipeline, and defendants knew or were reckless in not knowing that the large footprint deals would require larger discounts which would drive down gross margin;

(d)     Compellent's 4Q09 customer pipeline also included large enterprise deals, which generated higher revenue than Compellent's typical mid-size enterprise customer base, but had higher costs associated with the deals, which lowered gross margin; and

(e)     Defendants knew that its channel partners were not meeting their aggressive 2009 sales goals.  Some, including Insight, one of Compellent's largest channel partners, were 30%-50% behind their sales goals.

18.     A mere six days after Compellent announced its 3Q09 results, Compellent's Compensation Committee (which includes defendants Spreng and Beeler) amended

- 5 -

Compellent's 2009 Incentive Plan to make it easier for the Incentive Plan Defendants to reach their 2009 bonus targets. Specifically, defendants amended the 2009 Incentive Plan by lowering the profitability level target (non-GAAP net income) and by lowering the total revenue target, thus ensuring that the Incentive Plan Defendants more than doubled their year-end bonus.

19.     Moreover, shortly after announcing 3Q09 results, defendants took advantage of the artificial inflation in Compellent's stock caused by their misrepresentations and omissions to complete a secondary public offering at inflated prices. This offering provided defendants with the mechanism to unload 2.83 million of their Compellent shares for $51.7 million in proceeds. On November 17, 2009, Compellent issued 600,000 shares as part of its secondary offering. Days later, on November 23, 2009, as part of Compellent's secondary offering, defendants dumped 2.83 million shares and reaped $51.7 million in insider sales.

20.     That defendants' insider sales shortly followed the announcement of Compellent's 3Q09 results was not a coincidence. When Compellent announced its 3Q09 results, defendants already knew, or were reckless in not knowing, that to achieve sequential revenue growth in 4Q09 and meet its revenue projections, Compellent would need to offer steep discounts to close deals and generate revenue. By the start of the Class Period, Compellent had 75% of its deals in its pipeline and knew that the large footprint deals that would drive revenue required aggressive price discounts, which would drive down gross margin and profitability.

21.     After defendants' (i) materially false and misleading October 28, 2009 statements; (ii) completion of a secondary offering at inflated prices; and (iii) unloading of

- 6 -

millions of shares for insider proceeds of over $52 million, Compellent's stock continued to trade at artificially inflated levels reaching a high of $24.40 on January 19, 2010.

22.     On February 11, 2010, Compellent announced its 4Q09 results.  Although Compellent beat its revenue projections – it came at a cost.  Compellent's gross margin drastically fell to 52.9% – 440 basis points below 3Q09 (57.2%) and 200 basis points below 4Q08 (54.9%).  Compellent had sacrificed overall profitability to achieve revenue growth by providing steep discounts.  However, defendants falsely assured the market that it would continue to achieve strong growth and improved margins in 1Q10.

23.     The market reacted negatively to Compellent's 4Q09 results.  Compellent's share price fell from $21.77 on February 11, 2010, to $16.44 on February 12, 2010, a 24% decline.

24.     Analysts were "surprised" at the severe and unexpected drop in gross margin. Jason Adler, an analyst at William Blair & Co. stated that "*[m]anagement credibility has been damaged . . . especially following a recent and highly successful secondary offering*." These same sentiments were echoed by Kevin Hunt, an analyst at Hapoalim Securities: "We believe the fact that the company just completed a secondary offering in the December quarter will likely add to investor dissatisfaction."

25.     But, defendants' false assurances to the market that Compellent would continue to see revenue growth and improvement in gross margin achieved the intended effect of maintaining artificial inflation in Compellent's stock.  One analyst noted that since 1Q10 "is typically a seasonally weak quarter for the Storage Market, [Compellent's] flat guidance is impressive, in our view."  Analysts at Needham, maintained their "buy" rating

- 7 -

based partly on Compellent's revenue guidance of $35-$37 million and because Compellent "notes a strong pipeline and healthy deal activity."   Following Compellent's 4Q09 announcement, Compellent's share price eventually rebounded and reached a high of $18.74 on March 23, 2010.

26.     On April 7, 2010, less than two months after defendants provided the market assurances of positive revenue growth and continued improvement in gross margin, defendants pre-announced Compellent's 1Q10 results.   Instead of the $35-$37 million announced in February, revenue for 1Q10 would only be in the range of $31.5-$32 million – a significant miss.

27.     During the April 7, 2010 conference call with analysts, defendants attributed the drop in revenue to seasonality, large deal delays, increase investments in sales force and a tough economy.   Analysts were skeptical of defendants' explanations – commenting that as compared to its competitors, only Compellent suffered from these issues.   Kaushik Roy, an analyst at Wedbush, noted that "the revenue shortfall is specific to Compellent and is not representative of the rest of the storage industry."   Similar sentiments led another analyst to state: "Our take: competition rears its ugly head and channel model looks broken near term."

28.     Following the April 7, 2010 announcement, the market finally had a true picture of Compellent's financial condition – Compellent could not generate sufficient revenues for continued sequential growth without large price discounts.   On this news, Compellent's stock price fell from $17.56 on April 7, 2010  to as low as $13.02 on April 8 – below where it was trading in the beginning of the Class Period – a one-day decline of 26%

- 8 -

on heavy volume of seven million traded shares, and a 47% decline from its Class period high of $24.40.  Compellent's stock price continued to fall in the weeks that followed.

29.     Before and throughout the Class Period, defendants knew that without aggressive price discounts, Compellent could not maintain sequential revenue growth. Rather than disclose this negative information to investors, defendants reaped approximately $51.7 million in insider sales while Compellent's stock price was artificially inflated and more than doubled their year-end bonuses.

30.     That defendants throughout the Class Period made numerous false and misleading statements and omissions is further confirmed by the suspicious fact that shortly after the Class Period, and the filing of Compellent's Annual Report, in June 2010, Compellent's auditors (since 2003) were terminated without explanation.

31.     The impact of defendants' misrepresentations on Compellent's stock price is illustrated in the chart below:



**Compellent Technologies v. NASDAQ Computer Index**

**June 1, 2009 - July 26, 2010**

## JURISDICTION AND VENUE

32.     The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act,

15 U.S.C. §§78j(b) and 78t(a), and the regulations promulgated thereunder by the SEC,

including SEC Rule 10b-5, 17 C.F.R. §240.10b-5.

33.     This Court has jurisdiction over the subject matter of this action pursuant to

§27 of the Exchange Act and 28 U.S.C. §1331.

34.     Venue is proper in this District pursuant to §27 of the Exchange Act as

defendant Compellent and/or the Individual Defendants conduct business and the wrongful

conduct took place in this district, and the Company's principal executive offices are in Eden

- 10 -

Prairie, Minnesota, where the day-to-day operations of the Company are directed and managed.

35.     In connection with the acts alleged herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

36.     Co-Lead Plaintiff Andrew Scull, as set forth in the certification attached to his original Complaint and incorporated by reference herein, purchased the common stock of Compellent during the Class Period and has been damaged thereby.

37.     Co-Lead Plaintiff Andrew McDonald, as set forth in the certification attached to his original Complaint and incorporated by reference herein, purchased the common stock of Compellent during the Class Period and has been damaged thereby.

**The Corporate Defendant**

38.     Defendant Compellent Technologies Inc., develops, markets, and services enterprise-class network storage solutions which include software and hardware. Compellent was formed in March 2002 by defendants Soran, Guider, and Lawrence Aszmann.

39.     During the Class Period, Compellent's end-users (customers) included over 1,800 enterprises worldwide, across a wide variety of industries including education, financial services, government, healthcare, insurance, legal, media, retail, technology, and transportation.

- 11 -

573444_2

40.     Compellent's common stock is listed under the symbol CML on the New York Stock Exchange ("NYSE"), a highly efficient market.  Compellent's common stock has traded on the NYSE since March 23, 2009.  Prior to March 23, 2009, Compellent's common stock was traded on the NYSE Arca under the ticker symbol CML.  Compellent has been publicly traded since October 2007.

41.     Compellent completed an initial public offering on October 9, 2007, in which it sold 6,900,000 shares of common stock.  Compellent completed a secondary offering on November 17, 2009, in which it sold 600,000 shares of common stock.  Compellent insiders sold 2,830,000 shares of common stock as part of the secondary offering.

**The Individual Defendants**

42.     Defendant Philip E. Soran ("Soran") was, at all relevant times during the Class Period, Chairman, President, and Chief Executive Officer ("CEO") of Compellent and has held these roles since co-founding Compellent in March 2002.

43.     During the Class Period, while in possession of material, non-public, adverse information about Compellent, defendant Soran sold at least 130,000 shares of Compellent common stock (9.96% of his total available Compellent holdings) for roughly $2.37 million in proceeds.

44.     Defendant John R. Judd ("Judd") was, at all relevant times during the Class Period, Chief Financial Officer ("CFO") of Compellent.  Defendant Judd has served as CFO since June 2006.

45.     As detailed in ¶¶95-98, 109-114, 119-122 below, during the Class Period, defendants Judd and Soran made several false and misleading statements concerning

- 12 -

Compellent's financial outlook, including, but not limited to, revenue and gross margin. The false and misleading statements were issued in press releases, conference call transcripts, and SEC filings which contributed to the misleading picture of Compellent's revenue and profitability outlook, which resulted in Compellent's stock trading at artificially inflated levels throughout the Class Period.

46.     Defendant John P. Guider ("Guider") was, at all relevant times during the Class Period, Chief Operating Officer ("COO") and a member of the Board of Directors. Defendant Guider has served as COO and a director since co-founding Compellent with defendant Soran and Lawrence Aszmann in March 2002.

47.     During the Class Period, while in possession of material, non-public, adverse information about Compellent, defendant Guider sold at least 100,000 shares of Compellent common stock (8.39% of his total available Compellent holdings) for roughly $1.83 million in proceeds.

48.     Defendant Charles Beeler ("Beeler") was, at all relevant times during the Class Period, a member of the Board of Directors, Chairperson of the Compensation Committee, and a member of the Nominating and Corporate Governance Committee of Compellent's Board of Directors. Defendant Beeler joined the Board of Directors in July 2002.

49.     Defendant Beeler is a General Partner of El Dorado Ventures ("El Dorado"), an early-stage venture capital firm. As of April 1, 2010, entities affiliated with El Dorado continued to hold nearly 2.24 million shares or 6.9% of Compellent common stock.

50.     During the Class Period, while in possession of material, non-public, adverse information about Compellent, defendant Beeler sold at least 1.75 million shares of

- 13 -

Compellent common stock (44.4% of his total available Compellent holdings) for roughly $32 million in proceeds.

51.     Defendant R. David Spreng ("Spreng") was, at all relevant times during the Class Period, a member of the Board of Directors, Chairperson of the Nominating and Corporate Governance Committee and a member of the Compensation Committee of Compellent's Board of Directors.  Defendant Spreng joined the Board of Directors in December 2006.

52.     Defendant Spreng is the founder and Managing General Partner of Crescendo Ventures, an early-stage venture capital firm.  As of April 1, 2010, entities affiliated with Crescendo Ventures held nearly 3.23 million shares or 10% of Compellent common stock.

53.     During the Class Period, while in possession of material, non-public, adverse information about Compellent, defendant Spreng sold at least 850,000 shares of Compellent common stock (21.09% of his total available Compellent holdings) for roughly $15.5 million in proceeds.

54.     Each of the Individual Defendants is liable for engaging in a course of deceptive conduct that operated as a fraud or deceit on purchasers of Compellent securities by disseminating materially false and misleading statements and/or concealing material facts. Defendants' statements, omissions and conduct: (a) deceived the investing public regarding Compellent's business, operations, management and the intrinsic value of Compellent common stock; and (b) caused plaintiffs and other members of the Class to suffer damages thereby.

## CONFIDENTIAL SOURCES

55.    Former Compellent employees have provided plaintiffs with information demonstrating defendants' knowledge, or reckless disregard, of the falsity of their Class Period statements.   The confidential witnesses ("CW") include individuals formerly employed at the Company during the Class Period, whose accounts corroborate one another and confirm facts now admitted by the Company.   The witnesses provided information to plaintiffs on a confidential basis and are particularly described by job description, title, and/or duration of employment, thereby providing sufficient detail demonstrating that each was in a position to know the information provided and that their accounts are reliable.

56.    CW1, a Compellent Business Development Manager ("BDM") for the Los Angeles area from April 2009 through December 2009 was a main contact point for prospective end-users who were interested in purchasing a Compellent SAN system.  CW1 would work with the end-users to make the sale and then the channel partner would handle the details during closing.  CW1 reported to Noel Grant, the area manager, who reported to Vice-President of Worldwide Sales, Brian Bell.

57.    According to CW1, during his/her time at Compellent, 2Q09 through 4Q09, "footprint" deals were made with price concessions to hit revenue projections.  Because these deals included price concession beyond the ordinary storage network deal, the profit margin Compellent would earn on each deal was low.   CW1 also stated that BDMs had discretion over pricing equipment and that deals with a gross margin of 30 points or higher usually did not receive much scrutiny from management.  Sales were subject to approval,

- 15 -

however, by Noel Grant and/or Brian Bell.  According to CW 1, deals with higher discounts and lower gross margin received much more scrutiny by management.

58.     CW2, a Compellent Executive Vice-President of Sales at Company headquarters from 2002 through December 2008 helped design Compellent's channel model business mode.  CW2 also reported directly to defendant Soran.  Because Compellent would invoice the channel partner who would then invoice the end-user, the channel partners paid a "register price" which was set by Compellent.  The channel partner was free to sell the product at whatever price it could get from the end-user – as long as the price was over the "register price" set by Compellent.

59.     According to CW2, Compellent would provide customers with price concessions to close deals.  Price concessions had to be approved by "management" and depending on the size of the deal and the concession that was being offered, approval could reach as high as defendant Soran.  Information from CW2 corroborates CW1's statements that deals which included higher discounts were scrutinized and approved by management.

60.     CW3, a Compellent BDM for the Orange County, CA area from January 2008 through January 2009, was responsible for turning leads into sales.  CW3 reported to area manager Noel Grant.

61.     According to CW3, Compellent closed deals by "giving away product," which obviously hurt gross margin.  CW3 also stated that price discounting could go as high as 70%-80% off of the list price, with margins as low as 20%.  Also, prices on Compellent products were determined by Compellent.  If a deal required discounts to close, the discount would need to be approved by management.  Depending on the size of the discount and the

- 16 -

deal, approval would go as high up as defendant Soran. CW3 corroborates CW2's statements that approval of large price discounts would go as high as defendant Soran.

62. The Confidential Witnesses also confirm that in the lead up to the Class Period, the 100% channel partner business model that Compellent had relied on for sales generation was not operating as designed and not generating the revenue Compellent needed to achieve sequential growth. By 4Q09, channel partners were 30%-50% behind the sales goals set by Compellent.

63. CW4 was a Compellent Senior Marketing Manager operating out of the Company's headquarters from January 2008 through January 2010. CW4 was responsible for lead generation and the management of flow leads to the sales force. CW4 was also responsible for trade shows, web marketing, email campaigns and channel partner support. As part of his/her job duties, CW4 would assist the channel partners in marketing, including sales brochures, product information and best practices for marketing events. CW4 was also responsible for providing channel partners with marketing development funds used at marketing events hosted by the channel partners.

64. According to CW4, in early 2009, the channel partner model changed – instead of having the channel partners shoulder most of the work in making a sale to end-users, Compellent BDMs would provide channel partners with guidance and tools so that channel partners could become more effective at developing their own prospective customer leads.

65. Also, in 2009, Compellent undertook to attract more heavy-hitter channel partners and rely less on the "mom and pop" partners that had previously made up a large majority of Compellent's channel partners. Compellent created the new position of Strategic

- 17 -

Account Manager in 2009 to head up the effort to grow its relationships with larger channel partners.  As part of the refurbishing of the channel partner model, Compellent, for the first time, began to depart from their prior business strategy of focusing their selling efforts on mid-range enterprises and instead focused on large size enterprises.  Compellent also, for the first time, set aggressive sales goals for the channel partners.

66.    According to CW4, toward the end of 2009, around the start of fourth quarter (October-December 2009), some channel partners were not hitting their sales goals – and were behind by as much as 30%-50%.  One of those channel partners included Insight, who in 2007 and 2008 accounted for 13% and 10% of Compellent's sales, respectively – but in Compellent's Annual Report for 2009, Insight is no longer listed as a top channel partner. According to CW4, Insight was one of the larger channel partners who could not meet their 2009 sales targets.

## CONTROL PERSON ALLEGATIONS

67.    By virtue of their positions as officers and/or directors of Compellent and its subsidiaries, the Individual Defendants had access to undisclosed adverse information about Compellent, its business, operations, operational trends, finances and present and future business prospects.  The Individual Defendants acquired this information through Compellent's internal corporate documents, conversations and connections with other corporate officers, directors, bankers, traders, risk officers, marketing experts, and employees, attendance at Board of Directors' meetings, including committees thereof, and through reports and other information provided to them in connection with their roles as Compellent officers and/or directors.

573444_2

68.     For pleading purposes, it is entirely appropriate to treat the Individual Defendants collectively as a group, and to presume that the materially false, misleading and incomplete information conveyed to investors in Compellent's public filings, press releases and public statements, as alleged herein, was the result of the Individual Defendants' collective actions identified above.  The Individual Defendants, by virtue of their high-level positions within Compellent, were directly involved in the day-to-day operations of Compellent at the highest levels, directly participated in the management of the Company and were privy to confidential, proprietary information concerning Compellent, its business, operations, prospects, growth, finances and financial condition, as alleged herein.

69.     The Individual Defendants participated in drafting, producing, reviewing and/or disseminating the materially false and misleading information alleged herein, and knew, or with extreme recklessness, disregarded the fact that materially false and misleading statements were being issued regarding the Company, and approved or ratified these statements in violation of federal securities laws.

70.     As officers and controlling persons of Compellent, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to Compellent's financial condition and performance, growth, operations, financial statements, business, markets, management, risk, earnings and present and future business prospects, as well as to correct any previously issued statements that had become materially misleading or untrue.  The Individual Defendants' material misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

71.     The Individual Defendants, by virtue of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the content of the various SEC filings, press releases and other public statements pertaining to Compellent during the Class Period.  The Individual Defendants were provided with, or had unlimited access to, copies of the documents herein alleged by plaintiffs to be false and/or misleading prior to, and/or shortly after, these statements were issued and had the ability and/or opportunity to prevent the issuance of the statements or cause the statements to be corrected. Consequently, the Individual Defendants are responsible for the accuracy of the public reports and statements detailed herein.

72.     Each of the Individual Defendants is liable as a participant in a plan and course of conduct that operated as a fraud and deceit on Class Period purchasers of Compellent's securities.

### DEFENDANTS' FALSE AND MISLEADING STATEMENTS

**Background**

73.     Compellent derives 100% of its sales through its network of value-added resellers, which the Company refers to as "channel partners."  A 100% assisted channel model is unique in the data storage industry.  In 2009, Compellent's top ten channel partners accounted for 42% of revenues.  In 2007 and 2008, Compellent's top ten channel partners accounted for 45% and 47% of revenues, respectively.

74.     In early 2009, Compellent set out to revamp its channel partners.  Compellent undertook to attract more heavy-hitting channel partners who could attract large enterprise

deals.  Also, for the first time in 2009, Compellent set aggressive sales goals for its channel partners.

75.    Compellent employs a virtual manufacturing model.  Compellent's independent suppliers are notified when a deal is closed and components should be shipped directly to the customer.

76.    Based on its all-channel assisted sales model partners and its virtual manufacturing model, Compellent has very good visibility on its sales pipeline.  Typically, at the start of its quarter, Compellent has close to 75% of deals in its pipeline.  This enables the Company to provide quarterly forecasts with a high degree of confidence.

77.    In the months leading up to the Class Period, defendants stressed Compellent's strong customer pipeline, sequential increase in revenue and stabilizing gross margin.  This information was important to analysts because stable or higher gross margin and quarter over quarter increases in revenue meant that the Company was becoming less reliant on higher price discounts to gain market share.

78.    Revenue represents a company's gross earnings from the sale of its products and services before taking into account the costs associated with those goods.  Compellent's revenues are derived from the sale of Storage Center, consisting of software and hardware revenue and support and service revenue.

79.    Gross margin is the difference between revenue and cost of goods sold.  This is, in essence, the mark up a retailer takes on the goods it sells.  Gross margin is generally calculated as a percentage: the higher the gross margin, the more profit or mark up the retailer is generating on the goods.  Conversely, the lower the gross margin, the retailer is

- 21 -

taking a lesser mark up or providing higher discounts.  Gross margin is a very important business indicator as it demonstrates how profitable a company is at its most fundamental level, which in turn impacts its EPS.

80.     Compellent's gross margin is made up of product margin and service margin. Product margin relates to the mark up on the software/hardware components that make up the sale of a Compellent Storage Center.  Service margin relates to the mark up associated with maintenance contracts to Compellent Storage Systems.

81.     In the lead up to the Class Period, analysts and investors were interested in Compellent's gross margin rate because it indicated whether discounts were  employed to drive sales and revenue.  Because Compellent was a newer and smaller entrant to the data storage industry, analysts and investors were paying close attention to gross margin to determine price competition between Compellent and its larger and financially stronger competitors.  Analysts were especially interested in product margin, because Compellent had to apply discounts to product margin.  Moreover, analysts were interested whether Compellent's 100% reliance on channel partners – unique to the industry – would be successful.

82.     On April 30, 2009, defendants Soran and Judd hosted an investor conference call reporting 1Q09 financial results.  During the call defendants Soran and Judd promoted Compellent's sequential increase in revenue and "strong pipelines."  When discussing gross margin, Judd stated that "gross margin increased to 52.8% in the first quarter of 2009 compared to 52.2% in the same quarter last year."  Judd repeatedly told analysts that *the*

Company *"remain[s] very positive that the product margin will bump back in the future"*

and that "*it will be slightly higher in the remainder of the year*."

83.     Gross margin was clearly on the minds of the analysts in attendance, especially

whether Compellent would sacrifice gross margin (by giving higher discounts) to close deals

and increase revenue.  For example:

> Aaron Rakers: Okay.  And when you look at the gross margin line again, you – seems like you are managing that fairly well in this environment.  Can you update us again on what your longer-term target is and is there a situation where you would actually walk away from deals from a pricing perspective?
>
> John Judd: Very good question.  It's got two very different parts.  I think our long-term model is in the range of what it is this quarter to what it has been in the third quarter and the fourth quarter of last year.  So on that two to 3% range maybe more upwards from where we were in the first quarter.  I think that it's important to realize that we are trying to grow sales.  And yes there would be something we would walk away from but we generally always find even in a tough environment that we find ways to sell value and we get deals done.

84.     Analysts responded positively to defendants' statements about Compellent's

strong customer pipeline, stabilizing gross margin (especially product margin) and sequential

revenue growth.

85.     For example, Doug Reid, an analyst at Thomas Weisel Partners, following

Compellent's 1Q09 analyst call, noted that "[d]espite the conservative C209 revenue

guidance, *management is more bullish on the full-year outlook than was last quarter given*

*the existence of a strong pipeline despite a weak economy*.  Management guided to a 10-

15% sequential increase in opex in 2Q09 which reflects a seasonal increase in marketing

spend and new hires.  Finally, *gross margin is expected to be up slightly from the 1Q09*

*level for the rest of the year driven by strong service margins*."

- 23 -

86.     On July 29, 2009, Soran and Judd hosted an investor conference call reporting 2Q09 financial results.  During the call defendants Soran and Judd again touted Compellent's sequential revenue growth, strong pipeline and stabilizing and improving gross margin.

87.     Defendant Judd made the following statements before taking questions from analysts:

*Our gross margin increased to 53.7% in the second quarter of 2009, compared to 52.8% in the first quarter this past year*.

During the quarter, product margin was 49.2% and support and services margin was 64.6%.  *Our average selling price of a system returned to levels similar to 2008*.  While we generally believe these average selling price metrics can be misleading, *this is another sign that selling processes are returning to more normal levels*.

\*        \*        \*

I would now like to provide some guidance on the coming quarter. As Phil highlighted earlier, *we are gaining confidence that customer buying patterns are strengthening from earlier this year and this can be seen in the growth of our current pipeline and our registered deal activity*. Our current forecast is for revenue to be between $30 million and $32 million. This will mark our 16th consecutive quarter of revenue growth. We expect to continue to invest in our technology and sales teams.

\*        \*        \*

*I think when you see the third and fourth quarters, especially the fourth quarter, I think that quarter will be dominated by business from a new customer basis versus upgrades*, which is how it really happened last year.

88.     During the question and answer portion of the analyst call, Judd assured investors that gross margins would continue to improve sequentially:

**Jack Judd - *Compellent - CFO***

I still think long term we continue to be very positive and I still think, *like I said last quarter, that I will see some improvement in margin as we go*

- 24 -

*through the year.   Maybe this quarter will have more of a margin improvement than we just had.*

\*       \*       \*

**Jack Judd - *Compellent - CFO***

I don't know if I can say much more than I've already said on it.  *I do expect that margins will improve over the next two quarters and into 2010, and we'll have to see what happens then in the next quarter.*

Defendant Soran also stressed to investors that Compellent was confident about its sequential growth because "***the best we have is the visibility over their pipeline***.  I kind of highlight some of the sales operations advantages we have there, and the nice thing is that gives us the visibility, ***kind of the visibility of a direct model with the economies of a channel model***. So, you know, we're basing it a little bit of on that visibility we see there, when we came up with the revenue guidance."

89.    Following Compellent's 2Q09 analyst call, analysts continued to respond positively to defendants' statements about the Company's strong pipeline, projections of sequential revenue growth and gross margin improvement/stability for the remainder of 2009.

90.    For example, Doug Reid, an analyst at Thomas Weisel Partners, following Compellent's analyst call raised his 12-month price target from $17 to $20 and noted that "***[m]anagement expects GM improvement for the remainder of the year and into CY10 with product GM to increase sequentially from 49.2% in the quarter and service margins to remain in the 64+% levels***."

- 25 -

91.     Analysts at RBC Capital Markets and Morgan Stanley also raised 2009 revenue and EPS targets based on defendants' growth estimates on the back of strong service revenue and stable gross margin.

92.     On August 11, 2009, John Judd stated in response to questions about future growth and the Company's pipeline that:

> I want to emphasize that **we have a very, very good forecasting system and that we contact our manufacturers constantly**.  And so we know what's going to happen come the first –.
>
> So like on June 1, we have really good visibility into what we think we are going to close. Our industry really – it would be uncommon in our industry to have somebody come up and buy a huge system in a two-week period of time. That would be an unusual order.  **So I think most of the items that close in the second quarter you know about well – at least in the middle of the quarter so that you have inventory in the pipeline at the manufacturers**.

93.     Defendant Judd also commented about the downside of pursuing large enterprise deals, commenting that although "you can make a $2 million sale or a $1 million sale, there's also costs associated with it."

94.     Based on defendants' pre-Class Period statement, analysts and investors expected revenue to continue to grow sequentially and for gross margin to continue its upward movement – indicating that Compellent was cementing its foothold in the data storage industry and would rely less on discounts and price concessions to generate revenue.

**Defendants' October 28, 2009 Misrepresentations and Omissions**

95.     On October 28, 2009, Compellent issued a press release entitled "Compellent Announces Record Third Quarter 2009 Results."  The press release stated in part:

- Revenue increased 31 percent from the same quarter last year and 12 percent from the second quarter of 2009 to $32.2 million.  This was the company's 16th consecutive quarterly increase in revenue.

- 26 -

- GAAP net income totaled $2.3 million, or $0.07 per share.  Non-GAAP net income was $3.2 million, or $0.10 per share, adjusting for non-cash stock compensation expense.

\*      \*      \*

"***We believe our third quarter results demonstrate strong momentum as customers see the value proposition of our efficient, scalable storage solutions***," said Phil Soran, president and CEO of Compellent.  "This quarter we experienced strength across all geographies and a growing awareness of the Compellent solution.  As the demand for efficient storage technologies continue, regardless of whether companies are virtualizing IT, building private clouds or buying cloud services, ***we continue to gain traction in the marketplace***."

96.    The October 28, 2009 press release was followed by a conference call with analysts and investors hosted by defendants Soran and Judd.  As part of the scripted portion of the analyst call, defendant Soran stated in part:

Well, this was another exceptional quarter for Compellent.  ***We had strong growth in revenue, profitability and cash generation***.  Our operating income on a GAAP basis was 6.5% of revenue.  Excluding the effect of non-cash stock compensation, ***our non-GAAP operating income was a record 9.5% of revenue.  This demonstrates the progress we're making in growing our profits.  In fact, when you look at other financial measurements in 3Q, we once again delivered record results***.  In the third quarter, revenue grew 31% from last year to a record $32.2 million.  This represents a 12% increase from the second quarter and it marks our 16th consecutive quarter of revenue growth.

\*      \*

So let's look at the current macroeconomic environment.  ***We're seeing positive signs of improvement.  It is significantly better than two quarters ago***.  At the same time, end users continue to watch their spend[ing] closely and deals are competitive.  The good news for us is that end users can't quit storing their data but they can store more efficiently with Compellent.

While we're seeing momentum from enterprises of all sizes, ***in particular we're getting more medium and large enterprises choosing Compellent***. . . .

\*      \*      \*

- 27 -

Our team is currently making plans for 2010.  We see opportunity to increase our sales force and engineering teams at rates that are higher than 2009. ***We see improvements in sales opportunities and for continued strong growth in revenue***.

97.     Defendant Judd, during the scripted portion of the analyst call, stated in part:

Sequentially, revenue grew $3.5 million or 12%, our sixteenth consecutive quarter of sequential revenue growth.  We continue to grow in international markets.  International revenue increased to $5 million in the third quarter compared to $3.6 million in the year-ago period.

*         *         *

***Our gross margin increased to 57.2% in the just-completed third quarter of 2009, compared to 53.7% in the second quarter of 2009***.  During the quarter, product margin was 52.3%, and support and services margin was 69.4%.  The increase in product margin is a reflection of several strong margin deals versus margin improvements across all end users.

The increase in support and services margin is twofold, an increase in sales of third party maintenance contracts which are recorded at net, and increased revenue in professional services.

Operating expenses increased to $16.3 million in the third quarter of 2009 from $13.4 million one year earlier, as we continue to build infrastructure in sales and marketing and invest in our technology.  This 22% increase in operating expenses compares very, very favorably to our 31% increase in revenue. ***This expense leveraging is possible because of both our business model advantages and our dedicated work force that continues to deliver outstanding products to our business partners efficiently***.  We continue to grow our employee head count.  At September 30, we employed 360 employees compared to 268 one year earlier and 340 at the end of the prior quarter.  Since the first of the year, almost 70% of our new hires have been in sales and engineering.

*         *         *

Our balance sheet remains strong.  We ended the quarter with $109 million in cash and investments, an increase of $9 million from the end of 2008.  Our balance sheet includes $31.8 million of deferred revenue, an increase of $11.2 million from December, 2008. . . .

Our actual aging of receivables remains consistent with prior quarters.  I would now like to provide some guidance on the coming quarter.  As Phil

- 28 -

highlighted earlier, *we see strength in our markets. We continue to see strong growth in our current pipeline and our registered deal activity. Our current forecast is for revenue to be between $34 million and $36 million*. This would mark our 17th consecutive quarter of revenue growth. We expect to continue to invest in our technology and sales teams, so as a result we expect our operating costs in the fourth quarter will increase from third quarter spending by 8% to 10%.

98.     The following question and answer session ensued regarding Compellent's

gross margin, specifically product growth margin, which had reached record levels in 3Q09:

**Katy Huberty - *Morgan Stanley - Analyst***

Yes, got it, agreed. And then the other obvious question is whether you think the new level of product growth margin is sustainable given the pricing and competitive environment?

**Jack Judd - *Compellent Technologies - CFO***

Great question there Katy, and I think I'm going to encourage everybody to be *a little more conservative* than we were in this quarter. This was a really, really nice uptick in our revenue, I mean, in our gross margin, on the product, and I would say that we have a good chance that it will come back *a little bit*. And I want to emphasize again, is that you know we, we go out there and compete every day for deals. And we're going to continue.

*        *        *

**Alex Kurtz - *Merriman Curhan Ford & Co. - Analyst***

Okay, last question for Jack, here. Can you just give a little more color on the product margin increase quarter over quarter, sort of what were the drivers there, and thanks again.

**Jack Judd - *Compellent Technologies - CFO***

On the products side, and I'll go back to what we said when we did our talk, is that we had several deals that were noticeably higher on margin that actually had some pretty good ticker size to them. It wasn't as if you could go across all of our deals and notice that each one was a fraction higher than it was in the previous quarter. And so, I think it speaks well to our sales force. It speaks well to having consisting customers coming back for upgrades and for our new systems, and I think that the big pop in it was more related to deals, some deals, versus overall.

- 29 -

**Phil Soran - *Compellent Technologies - President, CEO***

But we were ***able to hold margins*** in a tough economic environment.

**Jack Judd - *Compellent Technologies - CFO***

Right.

**Phil Soran - *Compellent Technologies - President, CEO***

That's really positive.

**Jack Judd - *Compellent Technologies - CFO***

Really positive.

99.     Based on Compellent's October 28, 2009 press release and conference call, analysts issued a number of reports repeating defendants' statements and raising 4Q09 estimates, including EPS (which is tied to gross margin).  Analysts reacted positively to the 3Q09 results because according to Compellent's 10-Q filed on 8/7/09, traditionally "[t]he third quarter is generally the slowest sales quarter in the storage industry."  Compellent's 3Q09 gross margin increase and defendants' 4Q09 revenue projection played a key role in analysts raising their 4Q09 estimates.

100.     Based on defendant Judd's statement that investors should be only ***a little more "conservative"*** when modeling Compellent's gross margin and defendants' prior misrepresentations of margin stability, analysts estimated that gross margin would be slightly higher than the 4Q08 rate of 54.9%.  Analysts did not consider defendant Judd's statement that product margin would "***come back a little bit***" to infer the drastic 440 basis point decline in gross margin that Compellent suffered in the next quarter.

- 30 -

101.    On October 28, 2009, Doug Reid, an analyst with Thomas Weisel Partners,

issued a report entitled: "New Customer Growth and GM Expansion in Sep Q Suggest Core

Technology Remains Highly Differentiated."  The report stated in part:

> **Above-street guidance for C4Q09**.  CML guided midpoint C4Q09
> revenue to $35mn (up 30% y/y, up 9% q/q) slightly above prior TWP and
> consensus estimates of $34mn.  While management did not guide Dec Q GM
> or EPS, *management expects a slight decrease in GM* for the remainder of
> the year and into CY10 with product GM to decline sequentially from 52.3%
> in the Sep Q.  We estimate that guidance for the Sep Q implies an EPS in the
> range of $0.06-0.09 (consensus was at $0.07).  *Although revenue guidance is
> slightly above consensus, we believe that the company's improved overall
> margin profile could allow CML to deliver slight upside to our earnings
> estimates in the Dec Q*.

> *Raising estimates; we are incrementally more confident in CML's
> CY10 earnings growth outlook after clear Sep Q revenue beat and solid GM
> performance*.  We are raising our C4Q09 revenue estimate from $33.9mn to
> $35.0mn and raising our EPS estimate from $0.07 to $0.08.  We are also
> increasing our CY09 revenue estimate from $122mn to $124mn and our EPS
> estimate from $0.22 to $0.28.  *We are raising our CY09 GM estimate from
> 54.2% to 54.7%* on increased confidence that service GM will remain strong at
> 64+% levels (69.4% reported in C3Q09 compared to our estimate of 64.2%).

102.    On October 28, 2009, Alex Kurts, an analyst at Merriman Curhan Ford, issued

a report entitled "Solid 3Q09 As Operating Margin Gains Show Leverage in Model, Raising

Estimates, Reiterate Buy Rating."  The report stated in part:

> **Raising Estimates**.  Compellent issued guidance of $34-36M and opex
> growth of 8-10% Q/Q.  *Compellent expects gross margins to return to more
> normalized levels in 4Q – we are modeling 55.1% blended down from 57.3%
> Q/Q.*

103.    On October 28, 2009, Amit Daryanani, *et al.*, analysts at RBC Capital Markets

stated in part:

> **What's New?** *Citing an improving demand environment*, Compellent
> reported upside revenue of $32.2 million and non-GAAP EPS of $0.10 versus
> Street consensus estimates of $31.3 million and $0.05.  The company realized

- 31 -

solid execution, with strength across geographics, products, verticals, and customer base. ***Compellent provided a 4Q09 revenue outlook of $34.0-$36.0 million, which was above the Street consensus estimate of $34.0 million.*** On a 12-month basis, we increased our price target to $23 (was $21) to reflect our increased revenue and non-GAAP EPS estimates and maintained our Sector Perform rating and Speculative risk assessment.

104.   On October 28, 2009, Kevin M. Hunt, an analyst at Hapoalim Securities, issued a report entitled "Strong revenue growth, stronger EPS leverage in 3Q." The report stated in part:

> ***Strong execution continues in challenging environment; gross margin really impresses***. Compellent reported revenues of $32.4Mn, above consensus view of $31.1Mn. More impressive was the $0.10 pro-forma EPS versus Street consensus of $0.05. ***The big driver of the EPS upside was record pro-forma gross margin of 57.3%, which was 345bp above our estimate***. Some large, high-margin deals benefited product margin in the quarter, while strong professional services revenue kicked in to drive record maintenance margin of 69.6%.

> ***Outlook remains positive***. ***Compellent management indicated that business conditions have continued to improve and that the pipeline of deals remains strong heading into the December quarter. Revenue guidance of $34-$36Mn is above current Street consensus of $33.9Mn***. Management did indicate that they plan to more aggressively invest in OpEx, and that gross margin is likely to tick down in the quarter. We raise our December EPS estimate to $0.09 from $0.08 (consensus at $0.07), which isn't quite as strong an increase as the September quarter might imply.

105.   As a result of defendants' false October 11, 2009 statements and omissions, the Company's share price increased five percent from $17.96, on October 28, 2009 to $18.84 on October 29, 2009. In the weeks that followed, Compellent's share price continued to rise – reaching an all time high of $24.40 on January 19, 2010.

106.   Defendants' statements in ¶¶95-98 above were materially false and misleading when made because of the following undisclosed facts:

(a)      According to CW1, in 2Q09-4Q09, defendants had multiple large deals that required price discounts to close.  According to CW3, price discounting could go as high as 70%-80% with margins as low as 20%.  Because these deals included price concessions beyond the ordinary deals, they would lower gross margin, specifically product margin, and reduce overall profitability and EPS.  According to CW1, CW2 and CW3, these deals were reviewed and subject to approval by upper management, including defendant Soran;

(b)      Compellent had to give steeper price concessions on large footprint deals to close them and achieve revenue projections so that the Incentive Plan Defendants could more than double their year-end bonus by hitting targets in the 2009 Incentive Plan that defendants adjusted downward;

(c)      By the time of the 3Q09 analyst call, the Company had 75% of its deals in its pipeline, and defendants stressed to the public that they had extremely good visibility into the channel and a very good forecasting system;

(d)      Defendant Judd later admitted on February 11, 2010, that: (i) Compellent's 4Q09 customer pipeline included large enterprise deals, which generated higher revenue than Compellent's typical mid-size enterprise customer base, but had higher costs associated with the deals, which lowered gross margin; and (ii) such orders were made in the "preceding months" of 4Q09, which would include October 2009 – prior to defendants' false statements; and

(e)      According to CW4, defendants knew that the channel partners were not meeting their aggressive 2009 sales goals.  Some, including Insight, one of Compellent's largest channel partners, were 30%-50% behind their sales goals.

- 33 -

**Defendants' Actions Following Their October 28, 2009**
**Statements Demonstrate the Falsity of Their Statements**

107.   Because the Company was relying on large price discounts to meet or exceed

its revenue guidance to the detriment of gross margin, *i.e.*, profitability, the Compensation

Committee (which includes defendants Spreng and Beeler), a mere six days after the

October 28, 2009 announcement, amended the 2009 Incentive Plan by lowering the revenue

target from $141.1 million to $130.2 million and the profitability target threshold from 100%

to 54% of the profitability target.   This allowed defendants Soran, Judd and Guider to more

than double their year-end bonus.

**Defendants Took Advantage of the Inflation in Compellent's**
**Stock Price to Complete a Secondary Offering and Unload**
**2.83 Million Shares for Proceeds of Approximately $51.7 Million**

108.   Defendants' 3Q09 false statements caused the Company's share price to rise

5%.   Less than three weeks later, the Individual Defendants took advantage of Compellent's

inflated stock price to complete a Secondary Offering that allowed them to dump 2.83

million shares for proceeds of $51.7 million.

| Executive Officer | Number of Shares Sold | Proceeds | Percentage Sold |
|---|---|---|---|
| Philip Soran | 130,000 | $2,377,700 | 9.96% |
| John Guider | 100,000 | $1,829,000 | 8.39% |
| Charles Beeler | 1,750,000 | $32,007,500 | 44.40% |
| R. David Spreng | 850,000 | $15,546,500 | 21.09% |
| **Total** | **2,830,000** | **$51,761,600** | |

**Defendants' February 11, 2010 Partial Disclosure of the Truth**

109.   Before Compellent's 1Q10 announcement, Compellent stock was trading at all

time highs on the mistaken belief that Compellent could achieve sequential revenue growth

without drastic price concessions – which would impact gross margin, profitability and EPS.

- 34 -

110.    Analysts and the market were unaware that Compellent, in search of higher revenues had closed a higher number of large-sized enterprise deals that necessitated greater price discounts to close and pry away from competitors – thus severely reducing product margin. When this became known by the market on February 11, 2010, part of the inflation that defendants had put in Compellent's share price dissipated.

111.    On February 11, 2010, defendants announced Compellent's 4Q09 results. Compellent had achieved continued revenue growth but had suffered a drastic decline in gross margin from the previous quarter – a decline of 440 basis points – from 57.3% to 52.9%.

112.    During the February 11, 2010 analyst conference call hosted by Soran and Judd, defendant Soran stated in part:

> Revenue was up 35% from the prior year to a record $36.3 million. Compared to the third quarter revenue grew 13%, our seventeenth consecutive quarter of growth.
>
> GAAP net income was $1.3 million or $0.04 per share, and non-GAAP net income was $2.4 million or $0.07 per share excluding the affects of stock based compensation expense.
>
> *            *            *
>
> Jack and I just returned from investor meetings and analyst conferences. And there were some several [sic] common themes in the questions that are asked. I thought it'd be productive to address four of them in my comments.
>
> So for the first question, did we see a fourth quarter budget flush? We did not see end users "getting rid" of excess budget with unplanned purchases, but we did see end users with approved projects and budgets making buying decisions. ***So the orders we received were earned over the preceding months***.
>
> The second question, has there been increased pricing pressure affecting gross margins? Storage is always a competitive sell. ***We did not see***

*any significant changes from previous quarters in terms of competitive pricing pressure*.

*Our gross margins were lower than the third quarter, which as we've indicated during the last call they were exceptionally high*. But in general margins do fluctuate from quarter to quarter, but fourth quarter margins remained squarely within our business model.

Some factors that cause margins to vary include *conscious decisions to win key footprints, lower priced entry systems, deferred revenue and supplier costs*. We do not see any significant directional changes that would cause us to adjust our business model.

Third question, how do you balance the need to invest for top line growth and maximizing profitability?  At this stage of our development we will always focus on top line growth as a priority.  Our revenue growth is outpacing the competition, and we've become known as one of the fastest growing tech companies.  And because of our differentiated business model of virtual manufacturing, 100% channel sales, and leveraging the industry standard hardware we've proven profitability and leverage in our business.

\*       \*       \*

Now, more about the business.  This is a great quarter for new customer growth.  I was really pleased with both the quantity and the quality of these new users.  We added 185 new end user customers to end 2009 with a total of 1,812 distinct end users.  This means we added 534 new end users in 2009 alone.

113.   During the scripted portion of the analyst call, defendant Judd stated in part:

*Our gross margin was 52.9% in the fourth quarter of 2009 compared to 54.9% in the fourth quarter of 2008.  During the current quarter product margin was 48% and support and services margin was 66.1%*.

Our margins have varied considerably during 2009, from 57.2% to 52.8%.  *This is caused by many factors, including significant discounts can be necessary to acquire strategic end users.  Our revenue recognition practices require that all discounts are allocated to product revenue*.  If initial sales to end users include multiyear maintenance contracts this can reduce margins due to discounting practices.  And, finally, our tactical pricing of entry level systems to gain end users who in future periods will purchase upgrades.

573444_2

Operating expenses increased to $18.3 million in the fourth quarter of 2009 from $14.1 million one year earlier. This 30% increase in operating expenses compares favorably to our 35% increase in revenue and represents both our strategic initiative to add quality people that help grow revenue and engineering talent that expands our technology advantage.

\* \* \*

GAAP net income for the fourth quarter of 2009 was $1.3 million or $0.04 per share, consistent with the fourth quarter of 2008.

114.   The following question and answer session ensued regarding Compellent's

4Q09 gross margin drop:

**Katy Huberty -** *Morgan Stanley - Analyst*

You mentioned several factors that create volatility on the gross margin line quarter-to-quarter. Can you just rank the factors in order of magnitude that hit the product margin sequentially this quarter?

**Phil Soran -** *Compellent Technologies - President, CEO*

Well, the two big ones were probably the footprint deals we did and then, also, the margins you get on entry level deals, which you saw the result was we were able to get a lot of new end users that'll grow in the future and give good margins in the future.

**Katy Huberty -** *Morgan Stanley - Analyst*

Okay.

**Phil Soran -** *Compellent Technologies - President, CEO*

The deferred revenue is probably a little less but it does more product margin early on, but long term it helps margin and also reduces revenue risk in the future.

**Katy Huberty -** *Morgan Stanley - Analyst*

Okay, so would you characterize the footprint deals that came this quarter as a new trend that you'll see every quarter from here on out and that's where the best opportunities lie from here? Or do you think it was somewhat onetime in nature?

- 37 -

**Phil Soran - *Compellent Technologies - President, CEO***

Well, I don't know if I'd call it onetime in nature, but I would say it's – it won't be, you know, continual forever there.  I mean ***we did guide to have a little bit of improved margins in the next quarter, so it's opportunistic and you take advantage of the opportunity when it faces you***.

115.   Following the February 11, 2010 analyst call, some analysts criticized management for the drop in gross margin, claiming that managements' credibility had been damaged, because the drastic miss followed a successful secondary offering completed shortly after 3Q09 results were announced.

116.   On February 11, 2010, Jason Ader *et al.*, analysts at William Blair & Co. downgraded Compellent from Market Perform to Underperform and reduced estimates for 1Q09 based on Compellent's "disappointing" 4Q09 results.  The report also stated in part:

> ***Management credibility has been damaged, as many investors appear to be surprised (as we were) by the operating leverage retreat, especially following a recent and highly successful secondary offering***.  Management asserted that revenues will grow faster than expenses in 2010 (despite the reverse being true in the first quarter), but this seems like an empty promise absent specific revenue and expense guidance.

> \*        \*        \*

> ***EPS disappointed due to lower-than-expected operating margin driven mainly by lower product gross margins and increased expenses***.  Management noted increased discounting to win strategic footprint deals and higher mix of lower-margin entry-level deals (basic storage controller and disc enclosure hardware with less software content).

> Non-GAAP gross margin came in at 53.1%, ***a 424-basis-point decline over the prior quarter, and short of our estimate by 351 basis points.  This ends the margin expansion trend of the prior two quarters***.  Product gross margin and service gross margin were 48% and 66.4%, respectively (435 basis points and 313 basis points lower than the prior quarter, respectively).

117.   On February 11, 2010, Kevin M. Hunt, an analyst at Hapoalim Securities, issued a report entitled "Strong revenue growth, but lower GM & higher OpEx lead to EPS

Miss," which stated in part: "*We believe the fact that the company just completed a secondary offering in the December quarter will likely add to investor dissatisfaction, thus we expect shares to be under pressure near term*."

118.   Following Compellent's February 11, 2010 press release and analyst call, its stock price fell 24% from $21.77 on February 11, 2010 to $16.44 on February 12, 2010 due to the 440 basis point drop in gross margin and lower than consensus EPS.

**Defendants' February 11, 2010 Misrepresentations
and Omissions that Maintained Stock Price Inflation**

119.   Notwithstanding Compellent's drastic decline in gross margin, in an effort to maintain the artificial inflation in the Company's stock, defendants reassured investors that the Company would continue to experience strong growth and see improvements in gross margin:

120.   Defendants' February 11, 2010 press release stated in part:

- *Revenue increased 35 percent from the fourth quarter of 2008 and 13 percent from the third quarter of 2009 to $36.3 million*.

- Total installed end-user base grew to 1,812 customers, an increase of 185 new users from the previous quarter.

- *GAAP net income totaled $1.3 million, or $0.04 per share*. Non-GAAP net income was $2.4 million, or $0.07 per share, adjusting for non-cash stock compensation expense.

*      *      *

"This strong fourth quarter performance capped another successful year at Compellent," said Phil Soran, president and CEO of Compellent.  "We generated record results in revenue, end-user customers, earnings and cash. This demonstrates the positive impact that our Fluid Data architecture has on customer environments, the strength of our efficient business model, and our ability to drive revenue and profit with our channel partners.  *During the quarter, we continued to see our target midsized enterprise market as well as larger enterprises choosing Compellent over incumbent storage vendors*."

- 39 -

Full year 2009 financial highlights include:

- 2009 revenue grew by 38 percent to $125.3 million from $90.9 million in 2008.

- GAAP operating income was $3.7 million, or 3 percent of revenue, compared to GAAP operating loss of $3.2 million in 2008. Non-GAAP operating income was $7.9 million, or 6 percent of revenue, compared to non-GAAP operating loss of $1.0 million in 2008.

- ***GAAP net income was $4.8 million, or $0.15 per share, in 2009 versus*** a GAAP net loss of $416,000, or $(0.01) per share, in 2008.

Mr. Soran concluded, "As we look ahead, we remain positive about the growing demand for our innovative storage technology and we continue to build our presence in new markets, taking mind and market share from the competition. Our solution has broad appeal and is attracting strong interest from larger organizations and those considering emerging applications for cloud computing. As always, we remain focused on generating profits and cash, while making the investments required to maximize future growth and profit."

121. Defendant Judd, during the scripted portion of the analyst call made the

following misrepresentations and omissions:

I would now like to provide some guidance on the coming quarter. As Phil highlighted earlier, we see strength in our markets. ***We continue to see strong growth in our current pipeline and our registered deal activity. Our current revenue forecast range for first quarter 2010 is $35 million to $37 million***. Due to continued investments in talent during the first quarter of 2010, we anticipate that our operating expenses will grow 8% to 10% from fourth quarter spending.

During the first quarter of 2010 we expect gross margins will be higher than the just completed fourth quarter, but throughout 2010 gross margins will continue to fluctuate but remain within our long-term goals.

122. Defendants made further misrepresentations and omissions regarding revenue

growth and improvement in gross margin during the question and answer portion of the

conference call:

**Jayson Noland - *Robert W. Baird & Co., Inc. - Analyst***

Great. And a last question for me, Jack, maybe if you could characterize your pipeline of business now versus last year, and how do close rates feel?

**Jack Judd - *Compellent Technologies - CFO***

***Well, I think our pipeline is significantly better than it would be a year ago. Our pipeline always tends to grow, and it has a lot of quality accounts in it.*** We generally do not disclose exact levels within the pipeline, but ***I think it's an excellent pipeline.*** I don't know, Phil, if you want to comment on that?

**Phil Soran - *Compellent Technologies - President, CEO***

Yes, the pipeline, I would just say in general a year ago the way I'd describe it is that at this point in time a year ago people had not approved their budgets, they weren't delaying purchases, they had not approved their budgets, and they didn't get that done until March. They did not know what to budget.

***This year that's not the case. I think their budgets are approved, and they're cautious because of the economy and stuff. They're trying to be efficient and be smart with their purchases, but they're more of a normal business model. So it's significantly better than it was a year ago.***

123.     Because of defendants' continued false assurances regarding the Company's projected strong growth in 1Q10 and lack of full disclosure, the stock continued to trade at artificially inflated levels over the next two months.

124.     Analysts continued to believe defendants' false reassurances that Compellent would experience strong growth and improved gross margin based on Compellent's revenue guidance for 1Q10 and statements that gross margin would increase.

125.     On February 11, 2010, Doug Reid, an analyst at Thomas Weisel Partners relied on Compellent's guidance of $35-$37 million and expectations of gross margin improvement, and raised March quarter revenue estimate from $36.2 to $37.2 million and raised FY10 revenue estimate $160.3 to $165.4 million and EPS estimate from $0.44 to $0.45.

- 41 -

126.    On February 11, 2010, Rajesh Ghai, an analyst at ThinkEquity LLC maintained a hold rating on Compellent based on guidance for 1Q10.  The report stated in part:

> 1Q10 guidance is, as per our expectation, flat Q/Q at the mid-point.  Per our expectations, management guided 1Q10 flat with 4Q09 in the range of $35-37M.  ***Considering 1Q is typically a seasonally weak quarter for the Storage Market, CML's flat guidance is impressive, in our view***.

127.    On February 12, 2010, Eric Martinuzzi *et al.*, analysts at Craig-Hallum, in a report entitled "Q1 EPS Outlook Less Than Expected But Revenue Growth Persists.  Raising Target to $18," raised the price target to $18 from $15 "to reflect the company's better than expected revenue growth."  The report also stated:

> Q1 revenue guidance of $35-$37 million.  ***Pipeline and registered deal activity are up and Compellent is winning competitive displacements against larger storage companies***.

128.    Analysts at Needham, in a February 12, 2010 report entitled "CML: 4Q Report – Strong Revenue, EPS Slightly Below Street; CML Continues to Invest for Growth" maintained its "buy" rating based partly on Compellent's revenue guidance of $35-$37 million and because Compellent "sees a more normal budgeting/spending environment in 2010 and ***notes a strong pipeline and healthy deal activity***."

129.    Kaushik Roy, an analyst at Wedbush, initiated coverage on March 3, 2010, with a neutral rating and 12-month price target of $19 in a report entitled "Compelling Offering, But Stock Fairly Valued, Initiating With Neutral Rating."  The report stated in part:

> Outlook for Q1 FY'10
>
> ***Compellent has very good visibility into its sales pipeline.  Typically, at the start of its quarter, the company has close to 75% of deals in the pipeline.  This enables the company to provide quarterly forecasts with a***

- 42 -

*high degree of confidence*.  Compellent guided revenue for the March quarter to be in the range of $35M to $37M, which corresponds to a growth of -3.5% to 2.0% from the December quarter.  The company does not provide full year guidance.  *For the March quarter, the company expects gross margins to be higher than the 53.1% gross margins from the December quarter*.  Compellent indicated that it wants to focus on top-line growth and therefore plans to add to its headcount primarily in the areas of engineering and sales.

130.  Defendants' February 11, 2010 positive revenue guidance and statements about

gross margin improvement for 1Q10 were false and misleading because:

- By February 2010, at the latest, the Company had 75% of its deals in its pipeline and knew or were reckless in not knowing that they would not meet revenue projections without heavy discounts;

- Compellent has a "very, very good forecasting system";

- Compellent could not meet revenue projections without large price discounts – meaning that Compellent's gross margin would remain depressed; and

- Compellent could not achieve the stated gross margin increase because Compellent needed to provide steep discounts to achieve sequential revenue growth projections.

**Defendants Finally Reveal the Entire Truth**

131.  On April 7, 2010, Compellent pre-announced that it would fall far short of its

1Q10 revenue projections made only two months earlier on February 11, 2010.  The press

release stated in part:

Based on preliminary results that have yet to be reviewed by its auditors, *the Company expects to report revenue for the first quarter in a range of approximately $31.5 to $32.0 million*.  This would represent an increase of approximately 12% to 14% over the first quarter of 2009 and a *decrease of 12% to 13% compared with revenue in the fourth quarter of 2009*.  In its earnings call on February 11, 2010, the Company provided first quarter 2010 guidance revenue of $35 to $37 million.

- 43 -

132.   The April 7, 2010 press release was followed by an Analyst Conference Call
hosted by Soran and Judd.  As part of the scripted portion of the analyst call, defendant
Soran stated in part:

Thank you, Jenny.  Thanks everyone, for joining us today.  With me is
Jack Judd, our Chief Financial Officer.  Today, we are announcing preliminary
results for our first quarter of 2010.  ***We expect revenue to be in the range of
$31.5 million to $32 million, up approximately 13% to 14% from the first
quarter of 2009, and down 12% to 13% sequentially from the fourth quarter
of 2009***.  We anticipate that gross margins will be up sequentially from the
fourth quarter of 2009 by 100 to 200 basis points.  We expect operating costs
will be lower than the projections discussed in our fourth quarter 2009
earnings call.  Cash and investments increased approximately $7.5 million as
compared to year-end 2009.

Though we grew revenue year-over-year, ***we clearly expected to
perform better in the first quarter on the top line***.  We have been very proud
of our revenue growth since our IPO in October 2007, and especially our 17
straight quarters of sequential growth.  We are disappointed that we were
unable to continue this streak.  There are several reasons for the discrepancy
between our earlier expectations for revenue and the first quarter results.

First, seasonality.  As we have said previously, the first quarter of the
calendar year normally has weaker buying patterns.  This seasonality impacted
us more significantly than in past years.  In past first quarters, the Compellent
team has been able to grow despite the seasonal first quarter slow down.

Second, large deal delays.  We saw a number of larger opportunities in
our pipeline slip into the second quarter of 2010.  ***We simply did not close
nearly as many larger deals as compared to previous quarters.  While we
had good new account growth in the quarter, the slippage of these larger
deals resulted in a lower average deal size for the quarter***.  On the positive
side, we have already received verbal commitments that we have won several
of these deals and look toward to these contributing to future results.

Third, we made investments in district manager roles in high
opportunity areas to position ourselves for increased future scalability and
sales personnel changes in underperforming territories.  We underestimated
the impact of these changes, but we expect that future quarterly results will
benefit from these moves.

- 44 -

Finally, we saw the remnants of the tough economy within portions of our reseller base. Many, only late last year, began reinvesting in their sales resources and pipeline generation activities after a tough year. This had a delayed affect on the pipeline, which showed itself in the first quarter. Last year, we increased our channel development investment, and we need to make minor adjustments and keep investing in it. We have confidence in our channel model.

*In fact, our pipeline is stronger today than it was three months ago*. While reflection on the results will cause us to make some tactical adjustments, we believe that our fundamental business model and strategy are still sound. Some trend areas worth noting include, we had approximately 130 new end users in the first quarter. This strong result for a first quarter is approximately 33% greater than the number of end users acquired in the first quarter of 2009.

New end user growth is critical for our future, as this feeds both product upgrades and our support revenue. *In contrast to the fourth quarter of 2009, we expect to see a margin increase of 100 to 200 basis points*. We expect the deferred revenue will increase approximately $3 million to $3.5 million since the end of 2009, and our international business in the United Kingdom was robust and outlook there remains positive.

133.     The following question and answer session ensued regarding Compellent's

1Q10 revenue miss:

**Scott Schmitz - *Morgan Stanley - Analyst***

Okay. And you know last quarter, the gross margins came in a little bit, and there was some discounting that helped drive some of these deals home, could you have done the same thing, could you talk about the pricing environment a little bit, could you have priced a little more aggressively and closed some of these deals?

**Philip Soran - *Compellent Technologies - President, CEO***

*We said that we brought margins to bring deals home. We did footprint deals that we talked about there, but that wasn't the case this quarter*.

**John Judd - *Compellent Technologies - CFO***

This is Jack. I would say the quarter flowed at least for discounting extremely normal for normal SME type of deals, and I wouldn't say that we had any footprint deals.

- 45 -

**Alex Kurtz -** *Merriman Curhan Ford - Analyst*

Thanks, guys. If you can just sort of weight the different reasons that you listed in our press release about why you guys missed the number, can you give us a sense, was it equally weighted across all of the different factors here, or was one really a key driving factor?

**Philip Soran -** *Compellent Technologies - President, CEO*

No, there wasn't any big silver bullet that's going to summarize it there. There's a combination of little things that add up and hitting the wrong quarter and it showed the top line miss. I think, kind of put them in order of the way I wanted to talk about it, but I wouldn't put a weighting on it necessarily.

*     *     *

**Glenn Hanus -** *Needham & Co - Analyst*

Back on the seasonality factor, let's see, do you feel like you saw something there that was kind of more Company-specific to you, this quarter, or do you feel like everybody in the industry is pretty much seeing normal seasonality, and you just participated more this quarter?

**Philip Soran -** *Compellent Technologies - President, CEO*

So, first of all, if you look at the new accounts, that was a really good number, 130 new accounts in the quarter. It says there's positive out there also. But missing those large deals lowered that average deal size which hurt us, and I am not going to comment on what others found. We saw a few of those deals that we needed slip over, and like I said, some of them we have already closed. So it just didn't happen last quarter like we hoped it would.

134. As a result of Compellent's press release and analyst call on April 7, 2010, Compellent's share price dropped 26% from $17.56, on April 7, 2010 to $13.02 on April 8, 2010.

135. Following the April 7, 2010 press release and conference call, analysts were taken back by Compellent's 1Q10 preliminary results and slashed estimates for 2010. Analysts noted that as compared to its competitors, *only Compellent suffered from issues*

- 46 -

*with seasonality in 1Q10*.  Some analysts also questioned whether Compellent's unique sales system that relied 100% on its channel partners for sales was broken.

136.   On April 7, 2010, Kevin M. Hunt, an analyst at Hapoalim Securities, issued a report entitled "Bad revenue miss raises additional questions; slashing estimates."  The report clearly comprehended the meaning of Compellent's revenue miss: "***Our take here is that Compellent didn't price as aggressively this quarter (they indicated there were no larger "footprint" deals this quarter), but that could also explain the weaker revenues***."  Moreover, the report also questioned the Company's seasonality excuse and stated "*[o]ur take is Compellent's miss is mainly company specific*."

137.   On April 8, 2010, Kaushik Roy, *et al.*, analysts at Wedbush, issued a report entitled "Is Compellent Under Attack by Larger Vendors."  The report stated in part:

> Compellent pre-announced that revenues for Q1 will be in the range of $31.5M to $32M, down 12% (at the midpoint) from the prior guidance of $35-$37M. . . .
>
> ***Compellent is also experiencing some of the pains associated with its 100% reliance on channels***.  Channel partners are not as motivated as direct sales people in closing deals to meet the company's quarterly sales target.  Compellent indicated that it was not able to close several large deals during the quarter, even though it has verbally received confirmations for several of these.  Compellent will need to manage its channel partners to make up for the lack of flexibility from not having a direct sales force.  The company is investing in restructuring its sales team with the addition of district managers under regional vice-presidents in larger sales territories, which should help the company as sales ramps up.  The company remains committed to its 100% channel assisted sales model.
>
> *          *          *
>
> ***We believe that the revenue shortfall is specific to Compellent and is not representative of the rest of the storage industry***.  IT managers continue to invest in storage related technologies.  In addition the excellent earnings of

- 47 -

Xyratex and the raised revenue guidance by LSI during its analyst day further corroborate that the demand for storage systems remains robust.

138.    On April 8, 2010, Jason Ader *et al.*, analysts at William Blair & Co., issued an analyst report entitled "Compellent Technologies, Inc. Preannounces Lower Earnings on Seasonality and Large Deal Delays; Channel Model Looks Broken Near Term." The report stated in part:

> Our take: ***competition rears its ugly head and channel model looks broken near term*. *While it appears that there was a confluence of events that caused the top-line miss, the magnitude of the miss is what concerns us most ($5 million on a base of $36 million, which led to a sharp deceleration in year-over-year growth) – especially in a healthy demand environment for networked storage (see Xyratex results)*.** This translates into an uncomfortably high number of deals missed, lost, or slipped, and leads us to conclude that competitive factors were a major factor in the shortfall (though management did not want to concede the point). ***In addition, Compellent's 100% channel model is apparently not scaling as expected, which is likely to force Compellent to invest more in direct sales (pressuring operating margins) and begin engaging more directly with customers (cannot just rely on the channel anymore). . . .***
>
> Management remains adamant about the pipeline of business and stated that it is stronger today than it was 90 days ago. ***Yet given two consecutive problem quarters, investors will be skeptical of this metric*.**

139.    Following Compellent's normally scheduled analyst conference call for 1Q10 results on April 28, 2010, during which defendants Judd and Soran confirmed the results issued on April 7, 2010, analysts continued to criticize Compellent about its 1Q10 revenue miss.

140.    On April 28, 2010, Jason Ader *et. al*, analysts at William Blair & Co., issued an analyst report entitled, "Upgrading to Market Perform on Conservative Guidance and Reasonable Valuation." The report stated in part:

We believe the root causes of Compellent's recent issues have been twofold: 1) *investor expectations were too high before the first-quarter prerelease, having been partly fueled by management's optimism*, and 2) Compellent underinvested in its go-to-market model in 2009, which eventually caught up with it.  While competition is clearly fierce in the midrange storage systems market, we do not believe this was the main culprit over the last two quarters.  Competition is always challenging in the storage market – *we believe Compellent's issues were mainly self-inflicted and the Compellent product remains unique and differentiated*.

141.    Then on June 15, 2010, Compellent filed a Form 8-K with the SEC indicating that it had "dismissed" Grant Thornton, LLP, the Company's independent registered public accounting firm since 2002.  The SEC filing stated that the Company and its auditor did not disagree on any matter of accounting matter or practice, financial statement disclosure, or auditing scope or procedure.

## DEFENDANTS' SCIENTER

142.    Defendants knew that each of their misrepresentations alleged at ¶¶95-98, 109-114, 119-122 were false or misleading when made, or made them with reckless disregard of their misleading nature, based on facts alleged throughout this Consolidated Complaint and on the following facts.

143.    During the Class Period, defendants held themselves out to investors and the market as the persons most knowledgeable about Compellent's sales, finances, customer pipeline, channel sales force, discounting and business operations.  Each of the Individual Defendants occupied senior, or the most senior, positions at Compellent with responsibility for directing and managing Compellent's finances, business and financial reporting.  Defendants Spreng and Beeler, as Company directors and two of Compellent's largest shareholders, were privy to non-public inside information.

- 49 -

144.   Defendants Soran and Judd routinely communicated with analysts and investors during the Class Period and represented that they were informed of and knowledgeable about Compellent's business and finances, specifically Compellent's customer pipeline, its pricing strategy and sales force. Soran and Judd participated in Compellent's quarterly conference calls with analysts and investors during the Class Period. During these conference calls, Soran and Judd presented and responded to questions regarding Compellent's revenue, gross margin, sales pipeline and channel sales force.

145.   Due to defendants' constant communications with analysts, and their own review of analyst reports on Compellent, defendants knew everything analysts were representing concerning the Company. Further, defendants were aware of analysts' EPS and gross margin estimates for 4Q09 after the October 28 analyst call. Moreover, defendants were aware that analysts had maintained estimates for 1Q10 based on defendants' positive gross margin statements and revenue guidance made during the February 11, 2010 analyst call. Based on internal reports, customer pipeline, and forecasts defendants were receiving throughout Compellent's 4Q09, and 1Q10 they were aware or had reason to believe that Compellent would fall far short of gross margin, revenue and EPS estimates.

146.   Moreover, by 4Q09, defendants were aware that their traditional strategic partners, including Insight, who in 2007 and 2008 accounted for 13% and 10% of is annual revenues, respectively, were 30%-50% behind the aggressive 2009 sales goals set by Compellent. To achieve Compellent's revenue projections, defendants knew or were reckless in not knowing that at the start of 4Q09, they would need to offer steep price discounts to generate revenue.

147.     Defendant Soran received information related to price discounting on large deals.  Defendant Soran would be responsible for approving large discounts that were given to close deals.  Defendants admitted on February 11, 2010 that the drop in gross margin was due to the "conscious" decision to sign footprint deals that required large discounts.

**Information Received from Confidential**
**Witnesses Support an Inference of Scienter**

148.     Throughout the Class Period, defendants were aware of, or with extreme recklessness disregarded information demonstrating that Compellent could not achieve sequential revenue growth without large price concessions.

149.     Confidential former employees of Compellent, with whom plaintiffs conferred in drafting this Complaint, provided information confirming defendants' knowledge regarding price concessions to generate revenue and hit revenue projections.

150.     CW1, a Compellent BDM for the Los Angeles area from April 2009 through December 2009 was a main contact point for prospective end-users who were interested in purchasing a Compellent SAN system.  CW1 would work with the end-users to make the sale and then the channel partner would handle the details during closing.

151.     According to CW1, during his/her time at Compellent, 2Q09 through 4Q09, "footprint" deals were made with price concessions to hit revenue projections.  Because these deals included price concessions beyond the ordinary SAN deal, the profit margin Compellent would earn on each deal was low.  CW1 also stated that BDMs had discretion over pricing equipment and that deals with a gross margin of 30 points or higher usually did not receive much scrutiny from management.  Sales were subject to approval, however, by

- 51 -

Noel Grant and/or Brian Bell.  According to CW 1, deals with higher discounts and lower gross margin received much more scrutiny by management.

152.   CW2, a Compellent Executive Vice-President of Sales at the Company headquarter from 2002 through December 2008, helped design Compellent's channel model business mode.  CW2 also reported directly to defendant Soran.  Because Compellent would invoice the channel partner who would then invoice the end-user, the channel partners paid a "register price" which was set by Compellent.  The channel partner was free to sell the product at whatever price it could get from the end-user – as long as the price was over the "register price" set by Compellent.

153.   According to CW2, Compellent would provide customers with price concessions to close deals.  Price concessions had to be approved by "management" and depending on the size of the deal and the concession that was being offered, approval could reach as high as defendant Soran.  Information from CW2 corroborates CW1's statements that deals which included higher discounts were scrutinized and approved by management.

154.   CW3, a Compellent BDM for the Orange County, California area from January 2008 through January 2009, was responsible for turning leads into sales.

155.   According to CW3, Compellent closed deals by "giving away product," particularly at quarter-end.  CW3 also stated that price discounting could go as high as 70%-80% off of the list price, with margins as low as 20%.  Also, prices on Compellent products were determined by Compellent.  If a deal required discounts to close, the discount would need to be approved by management.  Depending on the size of the discount and the deal,

approval could go as high up as defendant Soran. CW3 corroborates CW2's statements that approval of large price discounts would go as high as defendant Soran.

156. The Confidential Witnesses also confirm that in the lead up to the Class Period, the 100% channel partner business model that Compellent had relied on for sales generation was not operating as designed and not generating the revenue Compellent needed to achieve sequential growth. By 4Q09, channel partners were 30%-50% behind the sales goals set by Compellent.

157. CW4 was a Compellent Senior Marketing Manager operating out of the Company's headquarters from January 2008 through January 2010. CW4 was responsible for lead generation and the management of flow leads to the sales force. CW4 was also responsible for trade shows, web marketing, email campaigns and channel partner support. As part of his/her job duties, CW4 would assist the channel partners in marketing, including sales brochure, product information and best practices for marketing events. CW4 was also responsible for providing channel partners with marketing development funds used at marketing events hosted by the channel partners.

158. According to CW4, in early 2009, the channel partner model changed – instead of having the channel partners shoulder most of the work in making a sale to end-users, Compellent BDMs would provide channel partners with guidance and tools so that channel partners could become more effective at developing their own prospective customer leads.

159. Also, in 2009, Compellent undertook to attract more heavy-hitter channel partners and rely less on the "mom and pop" partners that had previously made up a large majority of Compellent's channel partners. Compellent created the new position of Strategic

- 53 -

Account Manager in 2009 to head up the effort to grow its relationships with larger channel partners.  As part of the refurbishing of the channel partner model, Compellent, for the first time, began to depart from their prior business strategy of focusing their selling efforts on mid-range enterprises and instead focused on large size enterprises.  Compellent also, for the first time, set aggressive sales goals for the channel partners.

160.    According to CW4, toward the end of 2009, around the start of fourth quarter, some channel partners were not hitting their sales goals – and were behind by as much as 30%-50%.  One of those channel partners included Insight, who in 2007 and 2008 accounted for 13% and 10% of Compellent's sales, respectively – but, Insight was not listed in Compellent's 2009 Annual Report as a top channel partner.  According to CW4, Insight was one of the larger channel partners who could not meet their 2009 sales targets.

**Defendants Insider Sales Also Support
Plaintiffs' Scienter Allegations**

161.    While defendants were concealing material facts and issuing false and misleading statements to the public, the Individual Defendants sold over 2.83 million shares of their own Compellent stock for over $51.7 million dollars in profit.  The sales occurred on one day and as part of Compellent's secondary offering and only weeks after Compellent announced its record 3Q09 financial results and the Compensation Committee amended Compellent's 2009 Incentive Plan to ensure that the Individual Defendant reaped higher year-end cash bonuses.

162.    Notwithstanding the Individual Defendants' knowledge about Compellent's deteriorating gross margin and their duties as officers and directors of the Company to

- 54 -

disclose adverse material facts before trading in Compellent stock, the Individual Defendants personally profited from the artificial inflation in Compellent's stock price which defendants' misrepresentations, omissions and deceptive conduct created.

163.   The Individual Defendants were quite successful in timing their trades, capturing a peak price when selling.  The average trading price for Compellent stock in the 90 days after defendants' fraud was revealed was only $12.63 per share.  In sharp contrast, the Individual Defendants unloaded their stock at $18.29.  Both the timing and volume of their trades were suspicious.

164.   The Individual Defendants' Class Period trades are suspicious due to the large percentage of shares sold, the huge amount of profits gained, the volume of the trades and the opportunistic timing of the sales.  Because the Individual Defendants' trades are suspicious, they further bolster plaintiffs' scienter allegations.

| Executive Officer | Number of Shares Sold | Proceeds | Percentage Sold |
|---|---|---|---|
| Philip Soran | 130,000 | $2,377,700 | 9.96% |
| John Guider | 100,000 | $1,829,000 | 8.39% |
| Charles Beeler | 1,750,000 | $32,007,500 | 44.40% |
| R. David Spreng | 850,000 | $15,546,500 | 21.09% |
| **Total** | **2,830,000** | **$51,761,600** | |

165.   Defendant Beeler sold 1.75 million Compellent shares (44.40% of his total available Compellent holdings) for proceeds of $32,007,500 on November 23, 2009.  The opportunistic timing of Beeler's sales magnifies the suspicious nature of the sales.  Beeler sold on November 23, 2009 – as part of Compellent's secondary offering and on the heels of the Company's 3Q09 analyst call and amendment to Compellent's 2009 Incentive Plan by the Compensation Committee, of which Beeler is a member.

- 55 -

166.   Importantly, throughout the Class Period, defendant Beeler served as a Compellent Director and as a member of the Compensation Committee.  Moreover, Beeler is a partner at El Dorado – one of Compellent's largest shareholders and initial investors.  By virtue of his role as a director and member of the Compensation Committee, defendant Beeler was in a position to know that Compellent had misled investors into believing that Compellent's 4Q09 gross margin would be below the 3Q09 rate and 4Q08 rate.

167.   The suspicious nature of defendant Beeler's sales are further reinforced by comparing his November 23, 2009 trades to his holdings at the end of the Class Period and pre-Class Period trades.  Even considering Beeler's vested options at the end of the Class Period, defendant Beeler still managed to sell 43.82% of his holdings.  Moreover, defendant Beeler's Class Period trades far outweigh his non-Class Period trades.  From May 5, 2008 to August 25, 2009, defendant Beeler sold approximately 1.1 million Compellent shares for proceeds of $15,307,438, half the proceeds earned on November 23, 2009.

168.   Defendants Spreng sold 850,000 Compellent shares (21.09% of his total available Compellent holdings) for proceeds of $15,546,500 on November 23, 2009.  The opportunistic timing of Spreng's sales magnifies the suspicious nature of the sales.  Spreng sold on November 23, 2009 – as part of Compellent's secondary offering and on the heels of the Company's 3Q09 analyst call and change in Compellent's 2009 Incentive Plan by the Compensation Committee, of which Spreng is a member.

169.   Importantly, throughout the Class Period, defendant Spreng served as a Compellent Director and as a member of the Compensation Committee.  Moreover, Spreng is a partner at Crescendo Ventures – one of Compellent's largest shareholders and initial

- 56 -

investors.  By virtue of his role as a director and member of the Compensation Committee, defendant Spreng was in a position to know that Compellent had misled investors into believing that Compellent's 4Q09 gross margin would be below the 3Q09 rate and 4Q08.

170.    The suspicious nature of defendant Spreng's sales are further reinforced by comparing his November 23, 2009 trades to his holdings at the end of the Class Period and pre-Class Period trades.  Considering the options that vested at the end of the Class Period, defendant Spreng still sold 20.82% of his holdings.  Moreover, defendant Spreng gained more in one day of trading during the Class Period than his non-Class Period trades.  From May 5, 2008 to September 5, 2008 defendant Spreng sold approximately 1 million Compellent shares for proceeds of $11,833,125, nearly $4 million less than the proceeds reaped by Spreng on November 23, 2009.

171.    The heavy trading by defendants Beeler and Spreng in the months leading up to the Class Period further support an inference of scienter.  Defendants Beeler and Spreng were both initial investors in Compellent and two of its largest shareholders.  It is clear from their pre-Class Period trading that Beeler and Spreng were in the process of divesting their ownership stake in Compellent and were attempting to sell at a time when Compellent was trading at all time highs.  Beeler and Spreng participated in a course of conduct to maximize their profits from their initial investment in Compellent.

172.    Defendant Soran sold 130,000 shares (9.96% of his total available Compellent holdings) for proceeds of $2,377,700 during the Class Period.  The opportunistic timing and size of defendant Soran's stock sale magnifies the suspicious nature of the sale.  On November 23, 2009 – as part of Compellent's secondary offering and on the heels of the

- 57 -

Company's 3Q09 analyst call and change in Compellent's 2009 Incentive Plan by the Compensation Committee – defendant Soran unloaded 130,000 shares of Compellent securities for proceeds of $2,377,700. As the CEO of Compellent, defendant Soran was clearly in a position to know of and had access to internal information relating to Compellent's true financial condition.

173. The suspicious nature of defendant Soran's sales are further reinforced by comparing his November 23, 2009 trades to his holdings at the end of the Class Period and pre-Class Period trades. Considering the options that vested at the end of the Class Period, defendant Soran still sold 9.04% of his holdings. Moreover, defendant Soran's Class Period trades far outweigh his non-Class Period trades. Prior to the start of the Class Period, defendant Soran sold 35 shares for $464 on March 3, 2009. Soran's one-day sale during the Class Period of 130,000 shares far outweigh any sale he made prior to the Class Period and any options that vested during the Class Period.

174. Defendant Guider sold 100,000 shares (8.39% of his total available Compellent holdings) for proceeds of $1,829,000 during the Class Period. The opportunistic timing and size of defendant Guider's stock sale magnifies the suspicious nature of the sale. On November 23, 2009 – as part of Compellent's secondary offering and on the heels of the Company's 3Q09 analyst call and change in Compellent's 2009 Incentive Plan by the Compensation Committee – defendant Guider unloaded 100,000 shares of Compellent securities for proceeds of $1,829,000. As the COO of Compellent and a director, defendant Guider was clearly in a position to know of and had access to internal information relating to Compellent's true financial condition.

- 58 -

175.    The suspicious nature of defendant Guider's sales are further reinforced by comparing his November 23, 2009 trades to his holdings at the end of the Class Period and pre-Class Period trades.  Considering the options that vested at the end of the Class Period, defendant Guider still sold 7.15% of his holdings.  Moreover, before November 23, 2009, defendant Guider had not sold any of his Compellent stock.

176.    While the Individual Defendants profited, Compellent investors who had no insider knowledge purchased Compellent securities and suffered damages when the Company's securities dropped after it disclosed its true financial position.

**The Class Period Changes to the 2009 Incentive
Plan Supports an Inference of Scienter**

177.    On February 10, 2009, the Compensation Committee of the Board of Directors, which includes defendants Spreng and Beeler, and upon the recommendation of defendant Soran, established the 2009 Management Incentive Plan or 2009 Incentive Plan.  The 2009 Incentive Plan was designed to award a cash Incentive payment ("Cash Payment") to Individual Defendants Soran, Judd and Guider (collectively referred to as the "Incentive Plan Defendants").  Under the 2009 Incentive Plan, the Incentive Plan Defendants were eligible for additional compensation equaling 40% to 92% of their annual base salary.

| Executive Officer | 2009 Annual Base Salary | 2009 Target Cash Incentive Compensation |
|---|---|---|
| Philip E. Soran | $325,000 | $300,000 |
| John R. Judd | $240,000 | $115,000 |
| John P. Guider | $280,000 | $170,000 |

178.    The Incentive Plan Defendants would receive a bonus for achieving a: (1) revenue objective ("Revenue Target"); (2) profitability objective ("Profitability Target")

and/or (3) certain individual performance objectives (the "Individual Targets"). The Revenue Target and Profitability Target were set in February 2009 by members of the Compensation Committee and defendant Soran. The actual targets were publicly disclosed in April 2010 in the Company's Notice of Annual Meeting of Stockholders.

179. The Cash Payment was allocated as follows: 60% for achieving the Revenue Target, 20% for achieving the Profitability Target and 20% for achieving the Individual Targets.

180. Because the Revenue Target accounted for 60% of the Incentive Plan, three times as much as the Profitability Target (20% of the Incentive Plan), the Incentive Plan Defendants were incentivized to sacrifice profitability to achieve higher revenue and a higher bonus.

181. Six days after the start of the Class Period, defendants caused the Compensation Committee (of which defendants Spreng and Beeler are members) to amend the 2009 Incentive Plan to ensure that the Incentive Plan Defendants reaped a higher bonus. The Incentive Plan Defendants sacrificed profitability by luring in high revenue deals via high price discounts – the Incentive Plan Defendants ensured themselves a higher bonus – more than double.

182. The timing of the changes to the 2009 Incentive Plan is highly suspicious and supports an inference that defendants amended the 2009 Incentive Plan because: (1) they knew that channel partners, including Insight, were 30%-50% behind their sales goals; and (2) Compellent's pipeline included large footprint deals with heavy price discounts, which would maximize revenue at the expense of profitability. If the 2009 Incentive Plan had not

- 60 -

been amended, the Incentive Plan Defendants would not have met the Profitability Target or achieved a high percentage of the Revenue Target, resulting in a smaller bonus – nearly 70% less.

183.    The original Revenue Target for 2009 was $141.1 million. To be eligible for a Cash Payment, 75% of the Revenue Target had to be met. In other words, if the Company's 2009 total revenue was less than 75% of the Revenue Target (or $106.1 million), the Incentive Plan Defendants would receive nothing of the Cash Payment related to the Revenue Target. If the Company's revenue exceeded the 75% threshold, the Incentive Plan Defendants would be entitled to a portion of the Cash Payment related to the Revenue Target in accordance with a lock stop schedule based on percentage increases over the 75% threshold.

184.    The amendment to the Incentive Plan lowered the revenue target to $130.2 million and raised the threshold to 81% or $105.5 million. The change made it easier for the Incentive Plan Defendants to maximize their bonus.

185.    Taking into account defendants' 4Q09 revenue projections of $34-$36 million – under the original Revenue Target, the Incentive Plan Defendants would achieve 88% of the Revenue Target. By amending the 2009 Incentive Plan, to lower the Revenue Target to $130.2 million from $141.5 million, the Incentive Plan Defendants achieved 96% of the Revenue Target (as opposed to 88% of the original Revenue Target). As long as Compellent met or exceeded the 4Q09 revenue projections – the Incentive Plan Defendants would earn a much higher bonus.

573444_2

186.    The Incentive Plan Defendants also amended the Profitability Target to maximize their Cash Payment connected to profitability.  Instead of having to meet 100% of the Profitability Target ($6.8 million non-GAAP net income), the Incentive Plan Defendants only had to meet 54% of the Profitability Target or $3.67 million to start earning a Cash Payment.  By the close of 3Q09, Compellent had already achieved $3.5 million in non-GAAP net income – $170,000 from the 54% threshold, ensuring the Incentive Plan Defendants partial payment of Profitability Target and some upside.

187.    As demonstrated by the chart below, defendants conduct paid off as they achieved more than double their year-end bonus:



188.    The amendments to the 2009 Incentive Plan demonstrate that defendants knew the following: (1) channel partners, including Insight, were 30%-50% behind their sales

goals; (2) Compellent had closed or was in the process of closing large footprint deals that increased revenue but required higher discounts; and (3) Compellent's customer pipeline included a high number of deals that required steep discounts to close.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: THE FRAUD-ON-THE-MARKET DOCTRINE

189.    The presumption of reliance established by the fraud-on-the-market doctrine applies to these allegations because:

(a)    Compellent's common stock met the requirements for listing, and were listed, on the New York Stock Exchange, a highly efficient market;

(b)    As a regulated issuer, the Company filed periodic public reports with the SEC and regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases;

(c)    The daily trading volume of the Company's stock was substantial, with hundreds of thousands of shares traded each day;

(d)    Compellent was followed by securities analysts employed by several major brokerage firms, who wrote reports that were distributed to the sales force and certain customers of such firms and were available to various automated data retrieval services;

(e)    The misrepresentations and omissions alleged herein were material and would tend to induce a reasonable investor to misjudge the value of Compellent securities; and

(f)    Plaintiffs and the members of the Class purchased common stock during the Class Period without knowledge of the omitted or misrepresented facts.

- 63 -

190.   Based upon the foregoing, plaintiffs and the other members of the Class are entitled to a presumption of reliance upon the integrity of the market for Compellent securities for the purpose of class certification as well as for ultimate proof of their claims on the merits.

## LOSS CAUSATION/ECONOMIC LOSS

191.   During the Class Period, defendants made false statements, omissions and engaged in deceptive conduct that artificially inflated Compellent's stock price. Defendants' false and misleading statements and omissions caused and maintained artificial inflation in Compellent's stock price throughout the Class Period, until the truth regarding Compellent's true financial condition was revealed to the market on February 11, 2010 and April 7, 2010. These disclosures removed the prior artificial inflation in Compellent's stock caused by defendants' false statements, omissions and conduct. As a result of their purchases of Compellent stock during the Class Period, plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

192.   More specifically, on February 11, 2010 Compellent surprised the market when it announced its 4Q09 results. Defendants admitted that they had achieved revenue expectations only by offering large price discounts, thus lowering its gross margin by 440 basis points as compared to 3Q09 and 200 basis points below 4Q08 gross margin. Based on defendants' representations regarding Compellent's pre-Class Period stabilizing gross margin rate and 3Q09 gross margin rate, investors had been falsely led by defendants to believe that Compellent's 4Q09 gross margin would at a minimum meet or exceed Compellent's 4Q08 gross margin. Defendants concealed the fact that Compellent had

embarked upon a strategy of heavy price discounting in order to drive revenue, with the effect of drastically lowering gross margin and driving down EPS.

193.   When the truth regarding Compellent's gross margin was disclosed on February 11, 2010, Compellent's stock dropped from $21.77 to $16.44 on February 12, 2010, or $5.33 per share, on heavy volume of over five million shares, thereby damaging plaintiffs and other members of the class.

194.   The investment community expressed surprise and severe disappointment stating that management's credibility had been seriously jeopardized, especially given that the severe gross margin decline was announced shortly after Compellent had completed a successful secondary offering during 4Q09.

195.   Defendants' February 11, 2010 announcement, however, was only a partial disclosure of the truth, and did not remove all of the artificial inflation in the Company's stock caused by defendants' misstatements, omissions and conduct.  Although defendants did disclose that Compellent had engaged in massive discounting in 4Q09 to generate revenues, defendants continued to issue false and misleading statements about Compellent's financial condition and prospects for 1Q10 – projecting sequential revenue growth and an increase in gross margin.  This had the intended effect of maintaining the inflation in Compellent's stock price.

196.   When Compellent announced on April 7, 2010 that it would fall far short of its revenue projections for 1Q10, the market became fully aware of Compellent's true financial condition – Compellent could not generate sufficient revenues for sequential growth without providing large pricing discounts.  When the market learned this information, the inflation

- 65 -

that remained in Compellent's stock price dissipated, and Compellent's stock price fell, thereby further damaging plaintiffs and other members of the class.  Compellent's stock dropped from $17.56 to $13.02 on April 8, 2010, or $4.54 per share, on heavy volume of over seven million shares.  Analysts specifically noted that Compellent's failure to hit revenue projections was firm-specific and could not be blamed on industry or macro economic conditions.

197.   The timing and magnitude of Compellent's stock price declines negate any inference that the loss suffered by plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by plaintiffs and other members of the Class was a direct result of defendants' fraudulent statements, omissions and conduct to artificially inflate Compellent's stock price and the subsequent significant decline in the value of Compellent's stock when the truth was revealed to the market.

## NO SAFE HARBOR

198.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled in this Complaint.  Many of the statements pleaded herein were not specifically identified as "forward-looking statements" when made, and many were representations about the Company's present status.  To the extent there were any forward-looking statements: (a) there were no meaningful cautionary statements identifying the important then-present factors that could cause actual results to differ materially from those in the purportedly

573444_2

forward-looking statements; and (b) the particular speakers of such forward-looking statements knew that the particular statements were false or misleading, and/or the forward-looking statements were authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

199.   Any purported warnings contained in the press releases and statements quoted herein were generic and unparticularized boilerplate statements of risks, and thus lacked the meaningful cautionary language necessary to insulate any purportedly forward-looking statements.

## CLASS ACTION ALLEGATIONS

200.   Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Compellent common shares on the open market during the Class Period and who suffered damages as a result of their purchases (the "Class").  Excluded from the Class are (1) the Company and the Individual Defendants; (2) members of the immediate family of each of the Individual Defendants; (3) the subsidiaries or affiliates of the Company; (4) any person or entity who is, or was during the Class Period, a partner, officer, director, employee or controlling person of the Company; (5) any entity in which any of the defendants has a controlling interest; and (6) the legal representatives, heirs, successors or assigns of any of the excluded persons or entities specified in this paragraph.

201.   The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there

are, at minimum, thousands of members of the Class who purchased Compellent securities during the Class Period. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. During the Class Period, Compellent had more than 30 million shares of stock outstanding, owned by thousands of persons.

202. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions solely affecting individual Class members include:

- Whether defendants violated the 1934 Act as alleged herein;

- Whether defendants omitted and/or misrepresented material facts;

- Whether defendants knew or recklessly disregarded that their statements were false and misleading;

- Whether the price of Compellent's securities during the Class Period was artificially inflated due to non-disclosures and/or misrepresentations complained of herein; and

- The extent of damage sustained by Class members and the appropriate measure of damages.

203. Plaintiffs' claims are typical of the claims of the members of the Class as plaintiffs and members of the Class sustained damages arising out of defendants' wrongful conduct in violation of federal law as complained of herein.

204. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the other Class members.

205.   A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### COUNT I

**For Violation of §10(b) of the 1934 Act and
Rule 10b-5 Against All Defendants**

206.   Plaintiffs repeat and reallege ¶¶1-205.

207.   Each of the defendants is liable for making false and misleading statements, or failing to disclose material adverse facts and acting directly or indirectly as a participant in a course of conduct and/or course of business which: (i) deceived the investing public regarding Compellent, its business, finances and prospects; (ii) artificially inflated the price of Compellent common share during the Class Period; (iii) caused Class members to purchase Compellent stock at inflated prices; and (iv) permitted defendants to sell shares of Compellent stock at inflated prices.

208.   Defendants' direct participation included preparing and/or reviewing Compellent's false and/or misleading SEC filings and/or press releases, and knowingly or recklessly giving false information to securities analysts, money and portfolio managers and institutional investors in conference calls and other presentations.

209.   Despite their knowledge of Compellent's false and misleading statements, defendants failed, throughout the Class Period, to disclose material adverse facts about the

573444_2

financial condition and business prospects of Compellent, which caused the Company's SEC filings, press releases and other public statements issued during the Class Period to be materially false and misleading for the reasons set forth herein.  The defendants directly and indirectly, knowingly or recklessly engaged and participated in a course of conduct to conceal adverse material information about the business, finances, financial condition operations and future business prospects of Compellent.

210.    As a result of the above described acts of the defendants, they have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made in light of the circumstances under which they were made not misleading; or (c) engaged in acts, practices and a course of business which operated as a fraud or deceit upon plaintiffs and the other members of the Class in connection with their purchases of Compellent stock.

211.    Plaintiffs and the other members of the Class, at the time of the misrepresentations and omissions, did not know that these statements were false and misleading and believed them to be true.  In reliance upon the integrity of the market, plaintiffs and the other Class members were damaged as they paid artificially inflated prices for Compellent common shares.  Had plaintiffs and the other members of the Class known the truth, they would not have bought their common shares at the prices they paid.

212.    The market for Compellent securities was open, well-developed and efficient at all relevant times.  Defendants' misrepresentations and misleading omissions were the reason for the loss suffered by plaintiffs and the other Class members.

- 70 -

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against the Individual Defendants

213.   Plaintiffs repeat and reallege ¶¶1-212.

214.   Defendants acted as controlling persons of Compellent within the meaning of §20(a) of the Exchange Act, 15 U.S.C. §78t(a), as alleged herein.  By virtue of their positions as officers, directors or controlling shareholders of Compellent, their high-level positions, and participation in and/or awareness of the Company's operations, defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that plaintiffs contend are false and misleading.  Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

215.   In particular, each of the Individual Defendants had direct involvement or intimate knowledge of the day-to-day operations of the Company during the Class Period.  Therefore, each is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  Compellent controlled the Individual Defendants and all of its employees.

216.   By reason of such wrongful conduct, defendants are liable pursuant to §20(a) of the 1934 Act.  As a direct and proximate result of the wrongful conduct, plaintiffs and

- 71 -

other members of the Class suffered damages in connection with their purchases of the

Company's stock during the Class Period.

## COUNT III

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against the Individual Defendants

217.    Plaintiffs repeat and reallege ¶¶1-216.

218.    During the Class Period, each Individual Defendant occupied a position that

made him privy to non-public information concerning Compellent.  Because of this access,

each of the Individual Defendants knew that the adverse facts specified herein were being

concealed and that false and misleading statements were being made.  Notwithstanding their

duty to refrain from trading in Compellent stock while in the possession of material, non-

public information concerning Compellent, the Individual Defendants sold over 2.83 million

shares of the Company's stock, profiting from their fraudulent course of conduct.  The

Individual Defendants made the following sales during the Class Period, while they were

aware of adverse facts about Compellent that they knew had not been disclosed to the

market.

| Executive Officer | Number of Shares Sold | Proceeds | Percentage Sold |
|---|---|---|---|
| Philip Soran | 130,000 | $2,377,700 | 9.96% |
| John Guider | 100,000 | $1,829,000 | 8.39% |
| Charles Beeler | 1,750,000 | $32,007,500 | 44.40% |
| R. David Spreng | 850,000 | $15,546,500 | 21.09% |
| **Total** | **2,830,000** | **$51,761,600** | |

219.    The Individual Defendants violated §10(b) of the Exchange Act and Rule

10b-5 in that they, directly or indirectly:

573444_2

(a)      employed devices, schemes and artifices to defraud;

(b)      engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of Compellent securities during the Class Period; and

(c)      traded Compellent shares while in possession of material, non-public information.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

A.      Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.      Awarding plaintiffs and the members of the Class damages and pre-judgment interest;

C.      Awarding plaintiffs' reasonable costs, including attorneys' fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  August 9, 2010          ROBBINS GELLER RUDMAN
                                    & DOWD LLP
                                JONAH H. GOLDSTEIN
                                MICHAEL F. GHOZLAND


                                _____
                                s/MICHAEL F. GHOZLAND
                                MICHAEL F. GHOZLAND

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

HOLZER HOLZER & FISTEL LLC
MICHAEL I. FISTEL, JR.
WILLIAM W. STONE
200 Ashford Center North, Suite 300
Atlanta, GA  30338
Telephone:  770/392-0090
770/392-0029 (fax)

Lead Counsel for Plaintiffs

ZIMMERMAN REED, P.L.L.P.
CAROLYN G. ANDERSON, No. 275712
KIRSTEN D. HEDBERG, No. 344369
651 Nicollet Mall, Suite 501
Minneapolis, Minnesota 55402
Telephone:  612/341-0400
612/341-0844 (fax)
Carolyn.Anderson@zimmreed.com
Kirsten.Hedberg@zimmreed.com

Liaison Counsel

DYER & BERENS LLP
JEFFREY A. BERENS
303 East 17th Avenue, Suite 300
Denver, CO  80203
Telephone:  303/861-1764
303/395-0393 (fax)

Additional Counsel for Plaintiffs

573444_2

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 9, 2010, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on August 9, 2010.

s/MICHAEL F. GHOZLAND
MICHAEL F. GHOZLAND

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:        mghozland@rgrdlaw.com

# Mailing Information for a Case 0:10-cv-01525-PJS-SRN

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Mario Alba , Jr**
  malba@rgrdlaw.com

- **Carolyn G Anderson**
  carolyn.anderson@zimmreed.com,mary.burnsklinger@zimmreed.com,karen.colt@zimmreed.com

- **Jeffrey A Berens**
  jeff@dyerberens.com

- **Michael I Fistel , Jr**
  mfistel@holzerlaw.com

- **Michael Ghozland**
  mghozland@rgrdlaw.com

- **Jonah H Goldstein**
  jonahg@rgrdlaw.com

- **Kirsten D Hedberg**
  kirsten.hedberg@zimmreed.com

- **Kristin A Knudson**
  kristin@dyerberens.com

- **Justin P Krypel**
  jkrypel@faegre.com

- **Danielle S Myers**
  danim@rgrdlaw.com

- **Darren J Robbins**
  e_file_sd@rgrdlaw.com

- **David A Rosenfeld**
  drosenfeld@rgrdlaw.com,dmyers@rgrdlaw.com

- **Samuel H Rudman**
  srudman@rgrdlaw.com

- **William W Stone**
  wstone@holzerlaw.com

- **Wendy J Wildung**

wwildung@faegre.com,tstorlien@faegre.com

- **Mary Cullen Yeager**
  mcullenyeager@faegre.com,bfrismanis@faegre.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`